**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANNA SOROKIN,<br><br>                       Petitioner,<br><br>v.<br><br>CARL E. DUBOIS, Orange County Sheriff;<br>TOM DECKER, Field Office Director,<br>Immigration and Customs Enforcement;<br>TAE JOHNSON, Director, Immigration and<br>Customs Enforcement; ALEJANDRO<br>MAYORKAS, Secretary of the Department<br>of Homeland Security; and  MERRICK<br>GARLAND, Attorney General of the United<br>States.<br><br>                      Respondents. | Civil File No. _____<br><br><br><br><u>**PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**</u> |

<u>**INTRODUCTION**</u>

Petitioner Anna Sorokin has been detained by federal immigration officials since on or about March 25, 2021, without an opportunity for a bond determination. She petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  Anna Sorokin does not fall under 8 U.S.C. § 1226(c), the statute describing those noncitizens subject to mandatory detention, because under the canon of constitutional avoidance, § 1226(c) cannot authorize prolonged and indefinite detention. Ms. Sorokin is therefore entitled to an individualized bond hearing at which the government must show that her continued detention is justified.

All statements made above and below herein are made upon information and belief and are based on my conversations with Petitioner's trial counsel Todd Spodek, conversations with Petitioner, a review of documents contained in the files maintained by this office, a review of Petitioner's Criminal Court file from New York County, and a review of documents presented to our offices by Petitioner, and conversations with family members and friends of Petitioner and based on all prior proceedings held before the Immigration Judge in New York County, the Supreme Court Judge in New York County Criminal Division, the proceedings held in the Appellate Division First Department New York, County and all prior proceeding filed with the Board of Immigration Appeals.

There was **<u>no prior application</u>** made by this office on Petitioner's behalf for the relief sought herein.  However, the petitioner has filed at least two prior applications for bond and an appeal of the Immigration Judge's decision denying bond.

<u>**DETENTION OF PETITIONER**</u>

The Petitioner is currently detained in Orange County Correctional Facility, at 110 Wells Farm Road, Goshen, NY 10924, after being released on parole by the Board of Parole for the State of New York.

Prior to this, the Petitioner filed an I589 application and the Immigration and Customs Enforcement (ICE) served her with notice of a court date for

April 6, 2021 before the Immigration Judge at 201 Varick Street, New York

NY.

## PEDIGREE INFORMATION

Petitioner is a white female and a native and citizen of Germany.  The

Petitioner was released from prison on February 12, 2021 and was

being supervised by the New York State Department of Parole pursuant to

an order of the Honorable Justice Kiesel sentencing her to four (4) to twelve

(12) years in prison after she was convicted at trial.

The Petitioner later reported to ICE at 26 Federal Plaza, New York NY

where she as detained on March 25, 2021 after agents served her with a

notice of a final order of deportation based on the claim that Respondent

overstayed her terms of entry pursuant to ESTA.

Petitioner filed an application to extend her stay and the same is pending

before USCIS.  Prior to this the Petitioner filed an I589 application because

Petitioner claims to have a valid claim for asylum as she has a credible fear of

returning to Germany.

Petitioner is 30 years old. She was born in Russia but is now a citizen of

Germany. Her parents are married to each other and are living in Germany.

Petitioner has one sibling who also lives in Germany.

The Petitioner does not have any children and she has never been married.

Petitioner came to the United States in 2017 under ESTA.

## PETITIONER'S ARREST AND CONVICTION

Petitioner was arrested, detained at Riker's Island, charged, tried and

convicted of the following offenses:

a)     ATTEMPTED GRAND LARCENY IN THE FIRST DEGREE PL
       SECTION 110/155.42; AND
b)     TWO COUNTS OF GRAND LARCENY IN THE SECOND
       DEGREE
       UNDER PENAL LAW SECTION 155.40(1); AND
c)     GRAND LARCENY IN THE THIRD DEGREE UNDER PENAL
       LAW SECTION 155.35(1) AND
d)     THREE COUNTS OF THEFT OF SERVICES UNDER PENAL
       LAW SECTION 165.15(3); AND
e)     THEFT OF SERVICES UNDER PENAL LAW 165.15(2)

After being convicted, the Petitioner secured contracts with Netflix, RTL,

Info Network, and others to sell her story.   Justice Kiesel ordered the Defendant to

pay restitution to the judgment creditors that were named in the criminal case

against the defendant totaling approximately $200,000.00.

## NEW YORK STATE ATTORNEY GENERAL ACTIONS

The New York State Attorney General's Office therefore commenced an

action in the Supreme Court of the State of New York Albany County to seize the

sum of money the Petitioner was entitled to under the Son of Sam Law.  The

Petitioner also used $30,000 of the proceeds to pay her trial attorney

Todd Spodek, Esq. and $45,000 of the proceeds to pay her appeal and

immigration attorney, the Law Office of Audrey Thomas, PLLC.  The remaining balance of the funds has been used to pay for the Petitioner's rent and living expenses.

### PETITIONER'S CRIMINAL CASE IS ON DIRECT APPEAL

The Petitioner is under contracts with various media outlets to provide imagery contained in her cell phones that are not relevant to this matter and that the District Attorney's office and the New York City Police Department have no legitimate claim to now that this trial has ended.  Despite this, she has been detained by ICE and as a result cannot pursue appropriate relief from the Courts handling her appeal and criminal court issues.

The Order issued by Justice Kiesel awarded money judgments to the complainants and did not include any forfeiture provisions. The Petitioner has filed a direct appeal of her conviction and sentence and the appeal is pending before the Appellate Division First Judicial Department.

### TIES TO THE COMMUNITY

Petitioner has rented an apartment at 530 West 30th Street in New York County.   She is being supervised by the New York State Department of Parole in New York County.  Petitioner has contracts with several media outlets including but not limited to NetFlix, HBO, RTL and InfoNetwork.

The Petitioner has several contracts with other media outlets that are compromised by her detention.

The Petitioner has a host of friends in the United States who are standing with her and providing support and assistance to Petitioner.  The Petitioner is working on a bail reform project and is actively trying to be a positive example of how the United States provides full and fair opportunities to turn one's trials and tribulations into opportunities to make a difference.

## POSITIVE ATTRIBUTES

The Petitioner was released on early parole by the Board of Parole for she displayed exceptional qualities as an inmate at Albion Correctional facility where she was housed for three years during her sentence.  Petitioner has paid all of the restitution that Justice Kiesel ordered despite the fact that she is on direct appeal and was not obligated to do so.

The Petitioner continues to serve the interests of others via her work with bail reform and is using her conviction and sentence as a platform of hope for women and men across America.

The Petitioner has shown that she is a woman of good character and she has done enough to warrant the discretion and consideration of the Board of Parole.  Therefore, it is humbly submitted that the Petitioner is worthy of this Court's exercise of discretion and consideration.

## ISSUES RESPONDENT MUST OVERCOME

The Petitioner entered under ESTA.  The Petitioner was convicted of felony charges and served a three-year jail sentence as a result of that conviction.  The Petitioner t has an administrative final order of removal.

However, the Petitioner has valid claims for relief and thus it is respectfully submitted that this Court Should Consider the same in deciding this motion.

## RESPONDENT'S CRIMINAL HISTORY

The Petitioner has had contacts with the Criminal Justice system. The Petitioner has one felony conviction for attempted grand larceny and other charges.  The Petitioner respectfully requested that the Immigration Judge and the Department of Homeland Security take the Board of Parole's leniency and exercise of discretion into account and grant her application for bond as she is not a flight Risk nor a danger to society.  The Court denied the Petitioner's request finding that she was a danger to society.

## BASIS OF REMOVAL

It is alleged that the Petitioner was served with a notice to appear with allegations stemming from her I589 application.  The basis of the administrative order of removal is that the Petitioner over stayed her ESTA terms of entry. However, the Petitioner maintains that she did not purposely overstay her ESTA terms of entry as the Petitioner was arrested and was detained and

could not have departed the USA as she was housed at Albion Correctional
facility.

## ARGUMENT

The Petitioner should not be detained indefinitely.  The issue of whether she is a
threat to the community is res judicata as the Parole Board made that determination and
the level of scrutiny employed by the Immigration Court cannot be said to be greater than
that of the Parole Board.

Although Respondents purport to detain the Petitioner with no bond hearing,
because of one conviction that is on direct appeal and or her admission to the USA under
ESTA.  However, Respondents did not take Petitioner into custody at the time she was
released from criminal custody for any of those reasons.  Instead, they took no action
against Petitioner for several weeks and only took Petitioner into custody to satisfy the
demands from the District Attorneys' Office after Petitioner secured several contracts
that resulted in various TV and High Profiled Newspaper interviews.

After the interviews aired and ABC announced that it was doing a documentary
about the issues with the prison system that Petitioner intends to correct, Petitioner was
abruptly placed in mandatory detention.

The best evidence of this claim of retaliation is the fact that 90% of the documents
that the Respondent produced in furtherance of their attempts to continue the Petitioner's
detention indefinitely are gathered from social media, newspapers and other media
publications.

When initially detained the Respondent was subjected to cruel and inhuman treatment in that for several weeks she was held in solitary confinement and was only let out of her cell for one hour per day.  The Respondent was later moved to general population but continues to be segregated as an "ICE Detainee" as if she has some deadly plague that others need to be mindful of.

She has been forced to fight her removal first from New Jersey at Bergen County Jail and then from Orange County jail.

Petitioner has filed and perfected her brief on appeal with the Board of Immigration Appeals (BIA hereinafter) in furtherance of contesting the Courts' decision to first declare her a threat to society and then to decide that she is not at all entitled to bail.  That appeal has not yet been perfected.

It is submitted that considering that the Respondent's conviction is on direct appeal, she has filed a viable application to extend her stay under ESTA and no decision has been rendered on her appeal before the BIA, it is submitted that the Petitioner should not be made to remain in custody indefinitely.

Her case continues before the BIA and she must now continue his fight to stay in the U.S. before the Immigration Judge, with resolution of this case many months away. In the interim, the contracts the Petitioner signed are at risk of being cancelled, the opportunities that the Petitioner has worked hard to secure will be compromised irreparable and per adventure Petitioner is successful, the damage that results from her continued detention will be irreparable.

Because her detention is unlawful, Petitioner respectfully requests that this Court issue a writ of habeas corpus and order the Immigration Judge to conduct an individualized hearing at which the Government bears the burden of establishing that Ms. Sorokin's continued detention is justified.

## PARTIES

### A.    Petitioner

Anna Sorokin, was born in Russia and she entered the USA Lawfully under ESTA as she is a citizen of Germany.

### B.    Respondents

Respondents CARL E. DUBOIS, is named in his official Capacity  named in his official capacity as the Sheriff of Orange County, New York. In that capacity, Sheriff Carle E. Dubois is responsible for the Orange County Jail, a detention facility under contract with Immigration and Customs Enforcement ("ICE") and the physical location where Ms. Anna Sorokin has been in custody since on or about March 25, 2021. The address for Orange County Jail is 110 Wells Farm Road, Goshen, NY 10924.

Respondent TOM DECKER, is named in his official capacity as the Field Office Director for the New York Field Office for ICE within the United States Department of Homeland Security ("DHS") for New York. In that capacity, Field Director Decker has supervisory authority over the ICE agents responsible for making the initial custody decision regarding Ms. Anna Sorokin.  The address for the St. Paul Field Office is 26 Federal Plaza, New York, NY 10278.

Respondent TAE JOHNSON, is sued in his capacity as the Director, Immigration and Customs Enforcement within DHS, located in Washington, D.C. In that capacity, Director Johnson has supervisory capacity over ICE personnel in New York, and he is the head of the agency that retains legal custody of Ms. Sorokin. The address for ICE Headquarters is 500 12th St. SW, Washington, D.C. 20536.

Respondent ALEJANDRO MAYORKAS, is sued in his capacity as the Secretary of the Department of Homeland Security.  In this capacity, Secretary Mayorkas is responsible for the administration of the immigration laws pursuant to § 103(a) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1103(a) (2007), routinely transacts business in the Southern District of New York, supervises Field Director Johnson, is legally responsible for pursuing Ms. Sorokin's detention and removal, and as such is Ms. Sorokin's legal custodian. Secretary Mayorkas' address is U.S. Department of Homelasnd Security, Washington, D.C. 20528.

Respondent  MERRICK GARLAND, Attorney General of the United States, is sued in his official capacity as the Attorney General of the United States. In this capacity, he is responsible for the administration of the immigration laws as exercised by the Executive Office for Immigration Review, pursuant to 8 U.S.C. § 1103(g). He routinely transacts business in the Southern District of New York, is legally responsible for administering Ms. Sorokin's removal proceedings and the standards used in those proceedings, and as such is Ms. Sorokin's legal custodian. Attorney General Garland's address is U.S. Department of Justice, 950 Pennsylvania Ave. NW, Washington, D.C. 20530.

## JURISDICTION

Ms. Anna Sorokin is detained in the custody of Respondents in Goshen, New York which lies in the Southern District of New York. This Court has subject matter jurisdiction over this Petition pursuant to 28 U.S.C. § 2241, 28 U.S.C § 1331, and Article I, § 9, cl. 2 of the United States Constitution; the All Writs Act, 28 U.S.C § 1651; the Administrative Procedure Act, 5 U.S.C. § 701; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

Ms. Anna Sorokin's current detention as enforced by Respondents constitutes a "severe restraint on her individual liberty," such that Ms. Anna Sorokin is "in custody" in violation of the laws of the United States. *See Hensley v. Municipal Court*, 411 U.S. 345, 351 (1973). While the circuit courts of appeals have jurisdiction to review removal orders directly though petitions for review, *see* 8 U.S.C. § 1252(a)(1), (b), the federal district courts have jurisdiction to determine the legality of an individual's detention by ICE. *See, e.g.*, *Demore v. Kim*, 538 U.S. 510, 516-17 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Ms. Anna Sorokin has no administrative remedy to address the claims raised in this Petition, and even if there were administrative remedies which could provide relief, exhaustion would be futile.

Ms. Anna Sorokin claims that her detention is unconstitutional, and is being enforced based on her conviction which is on direct appeal and thus the Immigration

Judge has jurisdiction to hear her case. *Matter Of Armando Cerda Reyes*, 26 I&N

Dec. 528 (BIA 2015).

      With respect to the claim that Ms. Anna Sorokin overstayed her visa under

ESTA, it is submitted that the fact that there is an application for an extension of

time filed and accepted with USCIS, lends to the conclusion that Ms. Anna

Sorokin is not subject to mandatory detention.  Moreover, this issue would not bar

Ms. Sorokin's pursuit of the instant writ as the agency predetermined the issues

here in their administrative order of removal and Ms. Sorokin does not need to

exhaust applications for relief to pursue her writ.   *Garcia v. Shanahan*, 615

F.Supp.2d 175, 179–80 (S.D.N.Y.2009); *Rianto v. Holder,* No. CV-11-0137-PHX-FJM,

2011 WL 3489613, at *3 (D. Ariz. Aug. 9, 2011) (28 U.S.C. § 2241 does not specifically

require petitioners to exhaust direct appeals before seeking habeas relief); *see generally*

*Cisneros v. Napolitano*, No. 13-700 (JNE/JJK), 2013 WL 3353939, at *3 (D. Minn. July

3, 2013) (addressing habeas claim without discussing administrative exhaustion).

Exhaustion is also not required if it would be futile. *Pastor–Camarena v. Smith*, 977 F.

Supp. 1415, 1417 (W.D. Wash. 1997); *Duy Tho Hy v. Gillen*, 588 F.Supp.2d 122, 125–26

(D.Mass.2008) (holding that exhaustion of administrative remedies is not required

"where the agency has predetermined the issue before it").

      Ms. Sorokin has been seeking relief from the date she was taken into custody on

March 25, 2021 and continues to pursue release to date.

The Immigration Judge first ruled she was eligible for bond as the criminal conviction is on direct appeal.  However, thereafter reversed his position and determined that the Immigration Court does not have jurisdiction to hear the bond application.

It is submitted that the BIA would apply these same precedents as dispositive of Ms. Sorokin's claims and thus, although Ms. Sorokin has filed two appeals with the BIA, an administrative appeal would be futile. *See Monestime v. Reilly*, 704 F. Supp. 2d 453, 456-57 (S.D.N.Y. 2010).  Furthermore, Ms. Sorokin challenges her unlawful detention that has lasted over five months and should not be required as a prudential matter to endure additional time detained while awaiting BIA review.

## VENUE

Ms. Anna Sorokin resided in New York, NY prior to her detention.  She has been held by Respondents for five months in detention facilities in New Jersey and New York. Ms. Sorokin is subject to removal proceedings that are being conducted at 201 Varick Street, New York, NY and is currently housed at Orange County Jail in Goshen, NY. Therefore, the Southern District of New York is the proper venue to hear this Petition. Furthermore, this Petition was filed on August 4, 2021, when Ms. Anna Sorokin was physically located within the Southern District of New York, under the authority of Field Director Tom Decker and Orange County Sheriff Carl E. Dubois, both of whom are located within the authority of the court.

## FACTUAL BACKGROUND

**A.      Early Life and Experience**

Anna Sorokin grew up in Russia and ultimately immigrated to Germany with her

parents and sibling.

She worked in the fashion industry for many years and thus traveled across Europe

and the United States for work very frequently. She entered the United States under

ESTA and after several failed business ventures fell apart, she was arrested and charged

with various financial crimes against banking institutions and one civilian complainant.

The charges pertinent to the civilian were dismissed.  However, the jury returned guilty

verdicts as to some of the charges involving the banks, hotels and restaurant.

Anna Sorokin became an instant American reality star.  She was dubbed the Soho

Grifter and the media coverage was insurmountable. Ultimately, NetFlix bought the

rights to her life story and several media outlets from Germany, England, France and the

United States entered into contracts with Anna Sorokin.

Anna was sentenced to twelve years in prison based on her convictions but was

released after three years by the Board of Parole for the State of New York based on their

finding that she is worthy of considerations for early release.

Anna Sorokin found her place in society and was putting the pieces of her life

back together via her new found role as the beacon of hope for success and re-invention

of one's self through hard work and dedication.  After Anna Sorokin gave several

interviews wherein she condemned practices within the jail system and vowed to work on

bail reform as part of her platform, ICE took her into custody.

She thereafter applied for bond and was denied.  Due to COVID restrictions she was placed in 23 hours quarantine for several weeks.  She has filed for asylum based on death threats and other issues she faced as a result of the media attention and fame that resulted from her arrest.  Now she sits in jail awaiting a decision but Germany is not a safe place for her immediate return because there is flooding, a rise in COVID deaths and other unsafe conditions that make it more likely than not that harm will befall Anna Sorokin if she is returned to Germany.

### B.    Criminal History

Anna Sorokin has one arrest and conviction that stem from the same transaction and occurrence.  She is on direct appeal with her case and that appeal will not be addressed for several years.

She is alleged to have overstayed her visa under the terms of her admission under ESTA but maintains that she was in jail and thus could not depart and has filed an appropriate application with the USCIS for an extension of time and the same was accepted and is being processed.

### C.    Family Ties, Employment, and Finding Stability in the United States

Anna Sorokin does not have any family in the United States.  She has her dad, mom and sibling in Germany.

She has a host of friends and professional relationships that are here in the United States.  In fact, it is submitted that the ties Ms. Sorokin has to the United States are stronger than the ties she has to Germany in that with the exception of her parents and

sibling, ever close personal and professional relationship Ms. Sorokin has is in the United States.

### D.      Immigration Detention

Ms. Sorokin was detained when the media ran several stories about her and the District Attorney's office and other agencies became concerned about the publicity and popularity Ms. Sorokin garnered in the United States. Ms. Sorokin has hundreds of thousands of social media followers and the media cannot seem to get enough of her.

She is in the process of finalizing book deals, and documentary deals, in addition to several other media contracts that she has secured and was working towards finalizing at the time she was detained.

Ms. Sorokin was first detained at 26 Federal Plaza, New York NY and was subsequently transported to Bergen County jail in New Jersey, then to Orange County jail in New York where she is currently detained.

This detention has affected her psychological and emotional health in that she was subjected to 23 hours a day in solitary confinement having only one hour each day to leave her cell.  This affected Ms. Sorokin and cause her to have moments of non-stop crying and led to insomnia.  This detention has led to a situation of stress for Ms. Sorokin which is not surprising as it is well settled that civil detention of indefinite duration can cause "severe and chronic states of stress, helplessness, hopelessness, depression, anxiety and dread." Physicians for Human Rights, *Punishment Before Justice: Indefinite Detention in the US* 9-10, 27-30 (2011) (*available at* https://s3.amazonaws.com/PHR_Reports/indefinite-detention-june2011.pdf.

It is submitted that the deleterious effects of prolonged detention are magnified for those who have experienced trauma.  (*Id.*) Moreover, solitary confinement, which "is often used as a management tool for individuals with mental illness," has "disastrous psychological and physiological consequences," and often exacerbates mental illness. Nat'l Immigrant Justice Ctr. & Physicians for Human Rights, *Invisible in Isolation: The Use of Segregation and Solitary Confinement During Immigration Detention* 12-14 (2012) (*available at* https://s3.amazonaws.com/PHR_Reports/Invisible-in-Isolation-Sep2012-detention.pdf.

It is submitted that to subject Ms. Sorokin to continued detention as the issues with COVID-19 continues to rise, is tantamount to cruel and inhuman treatment as Ms. Sorokin has not done anything to warrant the extreme steps being pursued here in furtherance of her detention.

**E.**   **Ms. Sorokin's Removal Proceedings**

ICE has charged that Ms. Sorokin is removal for she is a convicted felon who overstayed her admission under ESTA.

In furtherance of their claim that Ms. Sorokin is subjected to mandatory detention, the Government pointed out that on April 6, 2021, the Petitioner appeared in Immigration Court and requested that she be released from custody. The Immigration Court, without authority, held a bond hearing, ultimately denying the respondent bond pursuant to INA § 236(a) because she failed to establish that she is not a danger to the community. The respondent reserved her right to appeal the April 6th Order and submitted her NOA to the Board on or after April 13, 2021. By that time, however, the Immigration Court had

already vacated the April 6th Order by issuing the April 8th Order after the Department

submitted a motion to reconsider the decision due to lack of the court's authority.

The Government further argued that the Immigration Judge properly vacated his

April 6th Order because he did not have the authority to redetermine the Petitioner's

custody determination. See Matter of A-W-, 25 I&N Dec. 45 (BIA 2009). Thus, the

Government maintains to date that Department's detention authority with respect to the

Petitioner who is removable as a VWP violator is pursuant to INA § 217(c)(2)(E); this

section does not confer authority on the Attorney General to review the Department's

custody determination. See INA § 217(c)(2)(E); Matter of A-W-, 25 I&N Dec. At 47.

The Government stressed their claim that the authority to detain a noncitizen

who is removable for violating the VWP and who seeks asylum was transferred to the

Department from the Attorney General by the Homeland Security Act of 2002, Pub.L.

No. 107-296, 116 Stat.235. See Matter of A-W-. 25 I&N Dec. at 47-48. Based on this

delegation, the Immigration Judge lacked authority to hold a bond hearing to redetermine

the Petitioner's custody status. See id. (The Immigration Court did not have authority to

review the custody status of a VWP overstay who was in asylum-only proceedings).

The Government argued that the Petitioner is a VWP violator and is not in removal

proceedings pursuant to the filing of an arrest warrant and the issuance of a NTA and

thus, the Immigration Court properly vacated its April 6th Order for lack of authority.

The Government has not addressed any of the issues pertinent to the question of

continued detention such as whether service of the final order of removal was actually

properly effectuated and or whether the direct appeal and pending USCIS application to extend the Petitioner's time to remain in the USA are dispositive.

It is submitted that the relief prayed for here is warranted for the Petitioner is under the strict mandates of the Parole Board and would not be at liberty without supervision as she is mandated to report to Parole weekly, has a daily curfew and other mandates the sufficiently provide for any safety concerns the Court or the Government may raise or want to consider.

It is submitted that Petitioner should not be made to face more months of detention as she starts over before the Immigration Judge and pursues her appellate rights again if that becomes necessary.

**F.   Planning for Ms. Anna Sorokin's Release**

It is respectfully submitted that there are less restrictive and more humane ways to further the goals of the Government.

For example, Anna Sorokin has a curfew and was required to report to the Department of Probation in New York County on a weekly basis.  She was not allowed to open any bank accounts and all financial transactions she is party to are funneled through her attorney's IOLA account so that the records are readily available for inspection upon demand.  Ms. Anna Sorokin's residence is approved by the Parole Board and she has surrendered her passport to ICE.

Ms. Sorokin could be released with an ankle bracelet, she could be restricted in the access she enjoys with social media or any other limitations that the Government may believe will protect the public from the threats they claim she poses.

More importantly, the Government can further their goals via adherence to the stringent restrictions the Parole Board fostered for the next 10 years as the Petitioner's parole does not end for the next ten years.

The Petitioner will not be a burden to the State as she has very lucrative contracts with NetFlix and other well established media groups.  Therefore, she will be self-sustaining for the entirety of her presence in the USA.

She has a place to live and means of providing for herself and her business ventures will actually provide jobs for Americans.  Ms. Sorokin has already provided for several people's financial security.  She has paid out over $75,000 in legal fees, and has hired camera men/women, videographers, photographers, and a team of American media personnel.  Her bail reform venture has already called to attention several activists who are eager to work with her. Her concerns about the conditions many inmates face has not fallen on deaf ears.  The Department of Corrections has actually launched an investigation into the concerns.

Ms. Anna Sorokin is truly a force of change that Americans can believe in and a source of inspiration for those who have fallen to believe they can get back up again.

## **LEGAL BACKGROUND**

### I.    **STATUTORY FRAMEWORK**

The statutory authority for detention during removal proceedings before a final order of removal is issued is 8 U.S.C. § 1226. Section 1226, in turn, consists of two main subsections: § 1226(a) and § 1226(c). The text of § 1226(a), the general statute authorizing detention of noncitizens, reads in pertinent part:

(a) Arrest, detention, and release

On a warrant issued by the Attorney General, an alien may be arrested and detained *pending a decision on whether the alien is to be removed from the United States*. Except as provided in subsection (c) of this section and pending such decision, the Attorney General--

    (1) may continue to detain the arrested alien; and

    (2) may release the alien on--

        (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or

        (B) conditional parole

8 U.S.C. § 1226(a) (emphasis added).

Section (b) then provides that "[t]he Attorney General *at any time* may revoke a bond or parole authorized under subsection (a) of this section, re-arrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b) (emphasis added).

Section (c)(1) describes a limited subset of detained noncitizens who are subject to mandatory detention, rather than the discretionary detention of section (a). It reads:

(1) Custody

The Attorney General *shall take into custody any alien* who—

    (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,

    (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,

    (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or

    (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,

> when the alien is released, without regard to whether the alien is
> released on parole, supervised release, or probation, and without
> regard to whether the alien may be arrested or imprisoned again for
> the same offense.

8 U.S.C. § 1226(c)(1) (emphasis added).

Under § 1226(a), a detained noncitizen is entitled to an individualized review of risk of flight and dangerousness to the community, in the form of a bond hearing. However, a noncitizen detained under § 1226(c) is not entitled to any opportunity to seek bond, and is instead mandatorily detained for the duration of their immigration proceedings. In other words, § 1226(a) is the broad, authorizing provision that allows for the discretionary detention of any noncitizen pending removal proceedings on an individualized basis, and § 1226(c) sets out an exception to the "general rule that allows bond hearings." *Sylvain v. Attorney Gen. of U.S.*, 714 F.3d 150, 153 (3d Cir. 2013). This exception prescribes a categorical detention regime applicable only to a limited sub-class of detainees.

## II. 8 U.S.C. § 1226(c) DOES NOT AUTHORIZE PROLONGED MANDATORY DETENTION

Ms. Anna Sorokin's detention for over five months without a bond hearing is an egregious violation of the Fifth Amendment's guarantee that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."

This is especially true considering the fact that COVID-19 has taken the lives of over 600,000 Americans to date and continues to threaten the health, safety and well-being of everyone forced to share close quarters with countless others.

Recognizing that the prolonged detention of noncitizens would raise serious due process concerns, the four circuits that have addressed the question have all agreed that § 1226(c) contains an implicit 'reasonableness' limit, after which individualized review or release is required. *Lora v. Shanahan*, 804 F.3d 601 (2d Cir. 2015); *Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ("*Rodriguez II*"); *Diop v. ICE/Homeland Sec.*, 656 F.3d 221 (3d Cir. 2011); *Ly v. Hansen*, 351 F.3d 263 (6th Cir. 2003).

It is submitted that the detention of a person who has already withstood the stringent process of parole board review successfully based on a claim of dangerousness is oxymoronic and violative of all principles of res judicata that this court should be bound by.

There is no question that five months in COVID-19 America far exceeds any measure of reasonableness, so Ms. Sorokin should be entitled to habeas relief.

In order to determine whether no-bond detention has become unreasonable, courts have employed either a six-month bright-line test or a multi-factor test. *Compare Lora*, 804 F.3d at 614-16 (six-month bright-line test) *and Rodriguez II*, 715 F.3d at 1138-39 (same), *with Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 473-75 (3d Cir. 2015) (multi-factor test) *and Ly*, 351 F.3d at 271-73 (same). As discussed below, Part B, this Court should apply the six-month bright-line test, under which a noncitizen is entitled to an automatic bond hearing after six months of § 1226(c) detention, because this test is supported by Supreme Court due process precedent, is more practical, will conserve judicial resources and the resources of the parties, and will better and more consistently protect individuals' core constitutional rights.

Under this test, it is submitted that the Court's refusal to grant the bond hearing requested by Ms. Sorokin is unconstitutional.  Ms. Sorokin was due a bond hearing with constitutionally sufficient procedural protections the moment she raised the issue that no proper service of the administrative order was made and pointed out that the proof of service states Petitioner was served in Batavia NY and Petitioner was detained at Albion Correctional and thus service in Batavia would have been impossible. *See Rodriguez II*, 715 F.3d at 1138-39.

It is submitted that even if this Court elects instead to follow a multi-factor reasonableness test, the Court should still find that Ms. Sorokin's detention has exceeded the bounds of reasonableness, and therefore due process requires a bond hearing "at which the Government bears the burden of proving that continued detention is necessary to fulfill the purposes of the detention statute," namely, preventing flight and danger to the community. *Diop*, 656 F.3d at 233; *see also Ly*, 351 F.3d at 273 (applying the multi-factor test and placing the burden on the government to show that detention prevents flight or danger to the community).

A.   <u>**Because Prolonged Detention Under § 1226(c) Raises Due Process Concerns, § 1226(c) Must Be Construed to Authorize No-Bond Mandatory Detention for Only a 'Reasonable' Duration**</u>

"Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas* 533 U.S. at 690. It is "well established" that the Fifth Amendment's Due Process Clause protects detained noncitizens like Ms. Sorokin from unconstitutional deprivations of liberty when in deportation proceedings. *Demore*, 538 U.S. at 523

(internal citations omitted). The Supreme Court "repeatedly has recognized that civil commitment *for any purpose* constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979) (emphasis added). Additionally, the Court has long held that civil detention is unconstitutional absent a sufficient justification and strong procedural protections. *See generally, e.g., Zadvydas*, 533 U.S. at 690; *Foucha v. Louisiana*, 504 U.S. 71, 80–83 (1992); *United States v. Salerno*, 481 U.S. 739 (1987); *Addington*, 441 U.S. at 425–27, 433; *Jackson v. Indiana*, 406 U.S. 715 (1972). Moreover, as detention grows in length, the justification for the increasingly severe deprivation of individual liberty must also grow stronger. *See, e.g.*, *Kansas v. Hendricks*, 521 U.S. 346, 363-64 (1997); *see also Chavez-Alvarez*, 783 F.3d at 474 (citing *Diop*, 656 F.3d at 232, 234); *Casas-Castrillon v. Dep't of Homeland Sec.,* 535 F.3d 942, 950 (9th Cir. 2008).

The Supreme Court has applied the canon of constitutional avoidance to preclude prolonged categorical detention without individualized review in the context of post-removal period detention under 8 U.S.C. § 1231(a)(6). In *Zadvydas v. Davis*, the Supreme Court held that post-removal period detention under § 1231(a)(6), like other "nonpunitive" civil detention, is subject to due process limitations. 533 U.S. at 690-92, 696-700. Applying the canon of constitutional avoidance, the Supreme Court limited detention under § 1231(a)(6) without an individualized justification to a presumptively reasonable period of six months—the time "reasonably necessary" to ensure removal—even though § 1231(a)(6) is silent on the length of detention it authorizes. *Id.* at 689, 697-98. After the six-month period has passed, noncitizens can demand that the government

justify their continued detention on an individual basis. *Id.* at 689 (explaining that courts must construe statutes to avoid constitutional concerns where "fairly possible").

Like § 1231(a)(6), § 1226(c) contains no express temporal limitation on the length of mandatory detention; however, § 1226(c) detention without bond should be similarly limited to a reasonable period. The Supreme Court has never addressed whether no-bond detention under COVID-19 conditions would violate the constitution, but all of the circuit courts addressing the issue have ruled that prolonged no-bond detention under § 1226(c) raises serious due process concerns and have ordered either a bond hearing or immediate release when detention becomes prolonged.

In the Second and Ninth Circuits, mandatory detention under § 1226(c) is "presumptively prolonged," and thus "'constitutionally doubtful'" when it "surpasses six months in duration." *Rodriguez II*, 715 F.3d at 1136-1137, 1139 (affirming an order for bond hearings for § 1226(c) detainees held longer than six months) (quoting *Casas-Castrillon*, 535 F.3d at 951); *see also Lora*, 804 F.3d at 606 n.11, 614-16 (adopting the six-month bright-line rule in use in the Ninth Circuit and affirming an order for a bond hearing for an individual detained under § 1226(c) based on the fact that he was detained for five-and-a-half months before being released on bond and "it [wa]s certain that, were he to be returned to custody, his total period of detention would exceed six months"); *Rodriguez v. Robbins*, 804 F.3d 1060, 1080-81 (9th Cir. 2015) ("*Rodriguez III*") (reiterating the holding in *Rodriguez II* that individuals detained longer than six months pursuant to § 1226(c) are entitled to bond hearings).

Similarly, in *Diop v. ICE/Homeland Security*, the Third Circuit granted habeas relief for a noncitizen held under § 1226(c) for thirty-five months. The court held that "the constitutionality of [mandatory § 1226(c) detention without a bond hearing] is a function of the length of the detention. At a certain point, continued detention becomes unreasonable and the Executive Branch's implementation of § 1226(c) becomes unconstitutional unless the Government . . . justifie[s] its actions at a hearing inquiring into whether continued detention is consistent with the law's purposes of preventing flight and dangers to the community." *Diop*, 656 F.3d at 232. The Third Circuit also concluded that in enacting § 1226(c), Congress "*did not intend* to authorize prolonged detention without . . . further inquiry into whether detention is necessary." *Id.* at 235 (emphasis added).

Likewise, in *Ly v. Hansen*, the Sixth Circuit held that detainees may not be held under § 1226(c) without bond beyond the time "reasonably required to complete removal proceedings in a timely manner." 351 F.3d at 266, 268 (affirming the district court order for a bond hearing after one and one-half years of detention). The *Ly* court read the constitutional requirement for reasonable duration as consistent with Congress's "clear" intent that "removal proceedings [for detained criminal noncitizens] were to proceed quickly." *Id.* at 269 (citing 8 U.S.C. § 1229(d)(1), which states that "[i]n the case of an alien who is convicted of an offense which makes the alien deportable, the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction").

While the Supreme Court held in *Demore v. Kim* that brief mandatory detention under § 1226(c) without a bond hearing did not violate due process, this holding was specifically premised upon the fact that the noncitizen had been detained for just six months, as well as evidence that, at the time, § 1226(c) detention more broadly was neither indefinite nor prolonged. 538 U.S. at 530-31; *id.* at 529–30 (relying on evidence that, at that time, removal proceedings were completed in an average time of forty-seven days and a median time of thirty days in 85% of cases, and that the remaining 15% of cases, in which an there is an appeal, were completed in an average of four months). Indeed, although the *Demore* Court upheld a narrow exception to the general civil detention rule that "liberty is the norm" absent procedural protections to ensure that detention is justified, *Salerno*, 481 U.S. at 755, this exception was narrowly tailored to the relatively brief period at issue in *Demore. Id.* at 513, 523, 527–29; *see also Lora*, 804 F.3d at 614 ("[I]n *Demore v. Kim*, [the Supreme Court] emphasized that, for detention under the statute to be reasonable, it must be for a brief period of time."); *Ly*, 351 F.3d at 276–77 (Judge Haynes, concurring in part and dissenting in part).

As the crucial fifth vote in *Demore*, Justice Kennedy acknowledged in his concurrence that "if continued detention bec[omes] unreasonable or unjustified," a noncitizen could be "entitled to an individualized determination as to his risk of flight and dangerousness." 538 U.S. at 532 (Kennedy, J., concurring); *see also id.* at 532-33 ("Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the detention is not to

facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons."); *Lora*, 804 F.3d at 614; *Rodriguez II*, 715 F.3d at 1137.

Since *Demore*, "the time that each immigrant spends in detention has . . . risen substantially." *Lora*, 804 F.3d at 604-05. Circuit courts now rely on the six months of detention at issue in *Demore* as a touchstone for determining whether no-bond detention under § 1226(c) has become unreasonably prolonged. *See, e.g.*, *Rodriguez III*, 804 F.3d at 1068 ("[T]he Court's holding in *Demore* turned on the brevity of mandatory detention under § 1226(c) . . . ."); *Chavez-Alvarez*, 783 F.3d at 474, 477-78 (holding that detention became unreasonable at some point between six months and one year of detention and noting that "the Court in *Demore* expected the detentions under section 1226(c) to be brief, and . . . this expectation was key to their conclusion that the law complied with due process."); *Rodriguez II*, 715 F.3d at 1137 ("[W]e have consistently held that *Demore*'s holding is limited to detentions of brief duration."); *Diop*, 656 F.3d at 234 (explaining that mandatory detention becomes more constitutionally "suspect" as it extends beyond the brief detention periods considered by the Supreme Court in *Demore*).

This Court has agreed that imposing a reasonable time limit on § 1226(c) detention "saves the statute from constitutional challenge." *Ly*, 351 F.3d at 270.

**No-Bond Detention Under § 1226(c) Is Unreasonably Prolonged After Six Months**

In determining whether § 1226(c) detention has become unreasonably prolonged, courts have applied two tests. Under the most efficient test, which should be applied here, no-bond detention under § 1226(c) is unreasonable after six months, and the detainee

must be given a bond hearing at which the Government must demonstrate that continued detention of the individual, rather than supervised release, is justified by flight risk or danger to the community. *See Lora*, 804 F.3d at 614-16; *Rodriguez II*, 715 F.3d at 1130-31, 1137-39.

Under the second approach—a multi-factor "reasonableness" test—courts consider a variety of factors to determine whether detention has become unreasonable, including: (1) the duration of detention in relation to the average time necessary for completion of proceedings identified in *Demore*; (2) the probable extent of future removal proceedings; (3) the likelihood that the detainee will eventually be removed; and (4) the conduct of the government and the noncitizen during removal proceedings, keeping in mind that noncitizens should not be penalized for pursuing legal remedies. *Alli*, 644 F. Supp. 2d at 543–45.

Even under this multi-factor test, however, the length of time in detention is the most important consideration. *See Diop*, 656 F.3d at 234 (emphasizing that even under the multi-factor test, "the constitutional case for continued detention without inquiry into its necessity becomes more and more suspect as detention continues past [the length of time deemed necessary in *Demore*—between a month and a half and five months]").

A bright-line rule that mandatory detention is reasonable only for six-months is superior to a multi-factor reasonableness test because a six-month test is supported by Supreme Court precedent and Congressional intent; better protects detainees' constitutional rights; conserves judicial and party resources by eliminating unnecessary litigation; and leads to more consistent application of core constitutional principles.

First, Supreme Court precedent supports drawing a line at six months. *Lora*, 804 F.3d at 615 ("*Zadvydas* and *Demore*, taken together, suggest that the preferred approach for avoiding due process concerns in this area is to establish a presumptively reasonable six-month period of detention."). In *Zadvydas* and *Demore*, the Supreme Court acknowledged that detention for up to six months under § 1231(a)(6) and § 1226(c) without an individualized determination of necessity is not per se unconstitutional, but the Court also strongly signaled in both cases that mandatory detention lasting longer than six months triggers heightened due process concerns. *Demore*, 538 U.S. at 530–31; *Zadvydas*, 533 U.S. at 701.

The *Zadvydas* Court noted that it had "reason to believe . . . that Congress previously doubted the constitutionality of [similar immigration] detention for more than six months," based on longstanding precedent. 533 U.S. at 701 (citing *United States v. Witkovich*, O.T. 1956, No. 295, pp. 8-9); *see also Rodriguez II*, 715 F.3d at 1139 ("[I]mmigration detention becomes prolonged at the six-month mark regardless of the authorizing statute.").

A judge in the Sixth Circuit has even advocated that no-bond § 1226(c) detention becomes presumptively unreasonable after the average length of proceedings noted in *Demore*—forty-seven days without an administrative appeal and 120 days with appeal. *Ly*, 351 F.3d at 275–76 (Judge Haynes, concurring in part and dissenting in part). Furthermore, after six months, "'the private interests at stake are profound' and 'the risk of an erroneous deprivation of liberty in the absence of a hearing before a neutral decisionmaker is substantial.'" *Rodriguez III*, 804 F.3d at 1078 (citation omitted).

Examining the immigration statutes as a whole further suggests that when Congress wants to authorize lengthy detention, it will do so explicitly and only with certain procedural safeguards, including review after the touchstone duration of *six months*. For example, under the Patriot Act, Congress authorized lengthy detention of suspected terrorists, but "in order to effect such lengthy detentions, the Attorney General is required to certify that the statutory criteria has been met, and the Attorney General must review the certifications every six months." *See Nadarajah v. Gonzales*, 443 F.3d 1069, 1078-79 (9th Cir. 2006) (citing 8 U.S.C. §§ 1182, 1226a, 1227, 1531–1537).

 Second, a bright-line test is a more practical and effective way to protect individual detainees' constitutional right to liberty, which we hold sacred for obvious reasons: "endless months of detention . . . has real-life consequences for immigrants and their families." *Lora*, 804 F.3d at 615-16.

Under a bright-line rule, individuals detained for a prolonged period would be entitled to a bond hearing without first filing a habeas corpus petition in federal court; under the multi-factor test, however, each detainee must file an individual habeas petition before even having a chance to argue for release.

It is unreasonable to require detainees to overcome the many barriers to accessing federal courts, often with no practical access to counsel, when there are matters of "grave constitutional concern" at stake. *Rodriguez II*, 715 F.3d at 1132. A multi-factor test erroneously presumes that detainees have knowledge and finances to obtain an attorney and that they have the language skills required to access the federal courts. *Cf. Rodriguez III*, 804 F.3d at 1073 ("Confinement makes it more difficult to retain or meet with legal

counsel, and the resources in detention facility law libraries are minimal at best, thereby compounding the challenges of navigating the complexities of immigration law and proceedings.").[1]

Without clear guidance from the courts about *when* detention becomes unreasonable, ICE may simply continue to detain those noncitizens facing prolonged detention who fail to file a successful habeas petition. *See Rodriguez III*, 804 F.3d at 1079 ("As a result of § 1226(c)'s mandatory language and the limited review available through a *Joseph* hearing, individuals are detained for years without adequate process."); *Ly*, 351 F.3d at 276 (Judge Haynes, concurring in part and dissenting in part) (arguing that, without "a judicial time limit" on mandatory detention, detention will continue, even when the duration is clearly unconstitutionally prolonged). Furthermore, without a bright-line test, detention of individuals whose detention is unrelated to avoiding flight or danger will continue if a person cannot file a proper habeas petition. *Cf. Lora*, 804 F.3d at 605 (noting that the district court ordered a bond hearing for the petitioner although he was detained under § 1226(c), and "[a]t that hearing, the government *did not contest [the petitioner's] eligibility for bail*" (emphasis added)). ICE personnel are simply ill-equipped to police for themselves the *constitutional* limits implicit in the detention statutes. *E.g. Chavez-Alvarez*, 783 F.3d at 477 (granting habeas relief and implying that

---

[1] *See also* Geoffrey Heeren, *Pulling Teeth: The State of Mandatory Immigration Detention*, 45 Harv. C.R.–C.L. L.Rev. 601, 603 (2010) ("Unfortunately, litigation is unlikely to be a viable solution for most immigrants in prolonged detention. . . . it is logistically difficult to bring a habeas petition. Federal litigation is complex, resource-intensive, and time-consuming.).

ICE should have held a bond hearing well before the habeas petition was filed because after nine months of detention and numerous IJ hearings, "the Government had, by then, enough exposure to Chavez-Alvarez, and sufficient time to examine information about him to assess whether he truly posed a flight risk or presented any danger to the community"); *see also Diop*, 656 F.3d at 234 ("We cannot simply rely on the Government's determination of what is reasonable.").

When the government defaults to continuing detention without a bond hearing no matter the duration, individuals who merit release are especially likely to be detained for an unconstitutionally prolonged period when immigration court dockets are large in size, as they regularly are in the Southern District of New York and throughout the country. *Lora*, 804 F.3d at 616 (noting that without a six-month rule, there would likely be "endless months of detention, often caused by nothing more than bureaucratic backlog"). Additionally "many detainees choose to give up meritorious claims and voluntarily leave the country instead of enduring years of immigration detention awaiting a judicial finding of their lawful status." *Rodriguez III*, 804 F.3d at 1072. A bright-line rule would do away with this default to continue detention in the absence of a habeas petition; all detainees whose confinement has become presumptively unreasonable would be protected, even if lack of resources would preclude production of a sufficiently sophisticated habeas petition.

For these same reasons, the multi-factor test would result in a higher volume of federal habeas filings, burdening the resources of the courts, detainees, and the government. *Cf. Zadvydas*, 533 U.S. at 700–01 ("In order to limit the occasions when

courts will need to make [difficult judgments], we think it practically necessary to recognize some presumptively reasonable period of detention."). *Pro se* petitioners entitled to relief will also "pay" for the litigation by spending many unwarranted months in detention, given the slow nature of federal litigation and the need for additional administrative procedures once a court grants habeas relief. *See Alli*, 644 F. Supp. 2d at 542 (describing the administrative procedures required once a district court grants habeas relief in the form of ordering a bond hearing). Meanwhile, under a bright-line rule, there is no need for federal litigation—once detention becomes prolonged, bond hearings will be streamlined automatically into existing administrative proceedings, and immigration courts are accustomed to holding such hearings. *See Rodriguez III*, 8-04 F.3d at 1086 (holding that class members were entitled to automatic bond hearings after six months of detention).

Finally, the multi-factor test will lead to inconsistent results, to the detriment of the detainee's constitutional rights. Case law interpreting the multi-factor reasonableness test from other jurisdictions yields substantially different analyses and results in inconsistent application of core constitutional principles. *Compare Flores-Powell*, 677 F. Supp. 2d at 472–73 (granting habeas relief based on "[t]he factors employed in *Ly*," understood to mean (1) overall length of detention, (2) length of imprisonment for detainee's underlying criminal conviction, (3) whether resolution of removal proceedings was reasonably foreseeable, (4) whether the Immigration Court had acted promptly to advance its interests, and (5) whether petitioner had engaged in dilatory tactics) *with Akunvabey v. Adducci*, No. 3:13CV2781, 2015 WL 65529, at *5 (N.D. Ohio Jan. 5, 2015)

(holding that based on *Ly*, civil immigration detention for twenty-five months was reasonable after analyzing only (1) whether petitioner would have *any* foreseeable opportunity for removal, in the form of availability of travel documents, if ever ordered removed (*Zadvydas's* holding to the contrary) and (2) whether the government had "dragged its feet," while completely omitting constitutional analysis of the length of time petitioner had been detained); *see also Lora*, 804 F.3d at 615 (noting "the pervasive inconsistency and confusion exhibited by district courts . . . when asked to apply a reasonableness test on a case-by-case basis" and collecting district court cases from the Second Circuit demonstrating this inconsistency); Farrin R. Anello, *Due Process and Temporal Limits on Mandatory Immigration Detention*, 65 HASTINGS L.J. 363, 396, 400 (2014) ("District court judges in the Third Circuit have applied the reasonableness standard [from *Diop*] to interpret similar facts in different ways . . . . These disparities bolster the importance of a clear upper temporal limit for mandatory detention.").

### B. Ms. Sorokin's Mandatory Detention Has Become Unreasonably Prolonged

Ms. Sorokin has been detained for a total of five months since March 25, 2021. The Court has denied her a meaningful opportunity to challenge her detention, nor there has been no determination that her continued detention is warranted based on flight risk and the determination that she is a danger is in direct contrast to the Parole Board's finding only a month prior to this determination and there was no change in circumstance that was substantial enough to justify this view that goes against the Parole Board's finding.

Under either the bright-line rule or the multi-factor test, Ms. Sorokin's detention has become unreasonable, and she is entitled to relief from this Court.

Ms. Sorokin has been in ICE custody since March 25, 2021. Under the six-month rule, taking into account COVID-19 changes, Ms. Sorokin should be entitled to a constitutionally adequate bond hearing.  Ms. Sorokin is clearly entitled to a bond hearing where the government bears the burden of justifying her continued detention.

Likewise, under the multi-factored reasonableness test, Ms. Sorokin's detention is unreasonable. The most central consideration—length of detention "beyond the average times necessary for completion of removal proceedings which were identified in *Demore*," *Alli*, 644 F. Supp. 2d at 543—weighs heavily in favor of release.  538 U.S. at 529; *see also Araujo-Cortes*, 35 F. Supp. 3d at 548, 550 (holding that detention under § 1226(c) became unconstitutionally unreasonable under a multi-factor test after six months of detention).

Second, it is highly likely that Ms. Sorokin's removal proceedings will continue for untold months while she awaits a decision by the BIA and any subsequent appeal that becomes necessary. Unlike the petitioner in *Demore*, whose detention had a "definite termination point," 538 U.S. at 529, and who, according to the *Demore* majority, "conceded . . . to being a deportable alien for whom deportation was a real and imminent probability," there is "no end in sight" for Ms. Sorokin. *See Bourguignon*, 667 F. Supp. 2d at 182-83.

Third, it is not clear that the pending immigration proceedings will ever result in Ms. Sorokin's removal. Given the fact that she is claiming asylum, and has been trying to

extend her stay and most likely may secure relief either from USCIS or the Court. *Flores-Powell*, 677 F. Supp. 2d at 472; *see also Hussain v. Mukasey*, 510 F.3d 739, 743 (7th Cir. 2007) ("It would be a considerable paradox to confer a constitutional or quasi-constitutional right to release on a [noncitizen] ordered removed (*Zadvydas*) but not on one who might have a good defense to removal.").

Fourth, any unwarranted delay in this case was caused by COVID-19 issues, and other factors that are not in Petitioner's control. Furthermore, Ms. Sorokin has not engaged in dilatory tactics, and she has only pursued bona fide legal challenges to her removal. *See Leslie v. Attorney Gen. of U.S.*, 678 F.3d 265, 271 (3d Cir. 2012) (quoting *Oyedeji*, 332 F. Supp. 2d at 753 (rejecting the government's argument that the noncitizen's voluntary pursuit of bona fide legal challenges to removal renders the corresponding increase in time of detention reasonable because otherwise, the noncitizen would be "effectively punish[ed] for pursuing applicable legal remedies."). Therefore, this factor weighs in favor of her release.

This Court must construe § 1226(c) to only authorize detention of a reasonable duration. Because in light of COVID-19 concerns, under either the six-month presumption or the multi-factor test, Ms. Sorokin's detention has become unreasonably prolonged, he is entitled to relief.

### C.    Because § 1226(c) Cannot Authorize Further No-Bond Detention, Ms. Sorokin Is Entitled to a Constitutionally Adequate Bond Hearing

The courts have authority to fashion habeas relief as the equities require. *Schlup v. Delo*, 513 U.S. 298, 319 (1995); *see also Flores-Powell*, 677 F. Supp. 2d at 474. Given

the prolonged nature of her detention, Ms. Sorokin requests that this Court order a constitutionally adequate bond hearing, at which the government bears the burden of proving, by clear and convincing evidence, that Ms. Sorokin would pose a flight risk or a danger to the community, even under supervised release. *See Rodriguez III*, 804 F.3d at 1086-89 (affirming district court order of bond hearings after six months of detention, and periodic bond hearings every six months after that, in which immigration judges must consider alternatives to detention and the length of past detention thus far, with the burden on the government to prove dangerousness or flight risk by clear and convincing evidence); *see also Diop*, 656 F.3d at 235 (squarely placing the burden of proving that continued detention is justified on the government).[2]

## III.   BECAUSE MS. SOROKIN HAS A SUBSTANTIAL CHALLENGE TO REMOVABILITY, HIS MANDATORY DETENTION VIOLATES THE DUE PROCESS CLAUSE

It is submitted that placing a person who has already been determined to pose no threat to the community and who is not proven to be a flight risk in mandatory detention violates her due process rights because, unlike the detained noncitizen in *Demore* who conceded removability, Ms. Sorokin has substantial challenges to all alleged grounds of removability. *See* 538 U.S. at 513-14.

---

[2] Courts applying a bright-line rule require an administrative bond hearing after six-months of detention. *See Rodriguez II*, 715 F.3d at 1138-39; *Lora*, 804 F.3d at 613. Under the multi-factor approach, courts order a variety of habeas relief including a bond hearing in district court or an administrative bond hearing. *See, e.g.*, *Chavez-Alvarez*, 783 F.3d at 478 (ordering an administrative bond hearing); *Araujo-Cortes*, 35 F. Supp. 3d at 551 (ordering an administrative bond hearing, and if not completed within fourteen days, allowing the detainee to request a bond hearing in district court); *Flores-Powell*, 677 F. Supp. 2d at 479 (ordering a bond hearing in district court).

In *Demore*, Justices expressed concern that detaining noncitizens with substantial claims against removability violates due process. *See Demore*, 538 U.S. at 532 (Kennedy, J., concurring); *id.* at 577 (Breyer, J., concurring in part and dissenting in part); *id.* at 561 (Souter, J., dissenting) ("Some individual aliens covered by § 1226(c) have meritorious challenges to removability or claims for relief from removal. . . . As to such aliens, as with *Zadvydas* . . . the Government has only a weak reason under the immigration laws for detaining them.").

Several federal courts agree that "when a detainee who has a good-faith challenge to his deportability is mandatorily detained under § 1226(c)," his due process rights can be violated. *Gonzalez v. O'Connell*, 355 F.3d 1010, 1019-21 (7th Cir. 2004); *see also Lora*, 804 F.3d at 616 (noting, in a decision affirming a district court grant of habeas relief after prolonged detention under § 1226(c), that the petitioner was "an excellent candidate for cancellation of removal" and therefore he was a good candidate for bond); *Papazoglou v. Napolitano*, No. 1:12-cv-00892, 2012 WL 1570778, at *5 (N.D. Ill. May 3, 2012) (holding that a noncitizen's due process rights were violated when he was "mandatorily detained despite the fact that he ha[d] demonstrated substantial likelihood that he w[ould] be allowed to remain in the United States and w[ould] be released from custody"); *Bourguignon*, 667 F. Supp. 2d at 183 & n.10 (granting habeas relief in part because, unlike in *Demore*, the noncitizen in *Bourguignon* "vigorously contest[ed] the issue of his deportability," arguing he was eligible for deferral of removal under CAT); *see generally Rodriguez III*, 804 F.3d at 1072 (noting that "[n]on-citizens who vigorously pursue claims for relief from removal face substantially longer detention periods than

those who concede removability" and that individuals "who persevere through this lengthy process are often successful").

In Ms. Sorokin's case, the BIA has not reached any decision on her appeals, the Parole Board released her early finding that she is not a threat or a flight risk and she has been mandated to abide by the terms of her supervised release or face re-arrest and imprisonment for the next ten years. It is submitted that applying mandatory detention in his case violates due process because "the ultimate purpose behind [§ 1226(c)] detention is premised upon the alien's deportability," and there is a reasonable likelihood that he will never be deported. *Demore*, 538 U.S. at 531 (Kennedy, J., concurring).

### *The New York Metropolitan Area is an Epicenter of the Global Pandemic*

On March 13, 2020, former President Trump declared a national emergency in response to the coronavirus pandemic. At the time, there were over 1,600 confirmed cases in the United States and at least 46 deaths. Today, over a year later, there are more than 600,000 COVID related deaths and although the City recently re-opened, a new Delta Strain threatens future closings.

There has been an exponential growth in the outbreak has caused more death and health concerns than we could have ever imagined. The New York metropolitan area is now the epicenter of the COVID-19 in the United States with. Because the coronavirus that causes COVID-19 is particularly contagious, authorities are took unprecedented precautions to manage the public health crisis and minimize the transmission of the virus by reducing the opportunity for large groups of people to congregate. Governor Andrew Cuomo of New York ordered all non-essential workers to stay home; New York and New

Jersey banned all gatherings of more than 50 people; and New York City closed all schools, bars and restaurants.

### ***The Heightened Risk of Severe Illness or Death from COVID-19 in Jails***

Incarcerated persons have limited ability to take the precautionary steps that public health experts recommend. Jail design and operations make it impossible for the plaintiffs to engage in necessary social distancing, and they have no control over the movements of others with whom they live in close proximity and share spaces and resources.

According to infectious disease specialist Dr. Ranit Mishori, jails, prisons, and detention centers are settings that pose a "significantly higher" risk for the spread of infectious diseases like COVID-19 than the general community. In China, where the pandemic began, coronavirus suddenly exploded in prisons in early March, with 500 cases identified in five different facilities. Jails that hold pre-trial detainees, like the ones where Plaintiffs are currently detained by ICE, are a particularly high risk setting for contagion because of their large turnover of detainees on a daily basis.

The highest known person-to-person transmission rate for COVID-19 to date has taken place in settings where people are in close proximity to each other without an ability to distance themselves: in a skilled nursing home facility in Kirkland, Washington, and on cruise ships in Japan and off the coast of California.

The conditions of jails such as those utilized by ICE in the New York area pose an even higher risk of the spread of COVID-19 than non-carceral locations like a nursing home or cruise ship due to their closer quarters, the proportion of vulnerable people detained, and lack of medical care resources.  Even when family or in-person legal

visitation to jails is sharply curtailed, it is impossible to seal entry and exit for staff, contractors, and vendors. Detainees within such facilities thus cannot be isolated from viruses circulating in the broader community. Preventative strategies utilized by the general public, like social distancing, hand sanitizing, and proper ventilation are neither readily available nor particularly effective. As a result, rapid transmission and widespread outbreak is virtually inevitable.

Once an infectious disease like COVID-19 enters a facility, there is frequently insufficient protective gear for staff and detainees, who live in close quarters and share common spaces and resources. When an outbreak occurs, jails are ill-equipped to engage in adequate containment and proper medical treatment for sick detainees. Medical experts agree that reducing the number of detainees is a necessary component of risk mitigation in a pandemic as widespread and serious as the one currently spreading across the United States. "Not doing so is not only inadvisable but also reckless given the public health realities we now face in the United States."

Any reduction in detained populations must focus on the most vulnerable detainees, in order to safeguard their health and the health of other detainees and jail staff.  As medical staff and resources within the facility becomes overwhelmed, regional hospitals and health centers end up bearing the brunt of providing healthcare for sick detainees—who are disproportionately likely to be those with pre-existing medical vulnerabilities. The rapid spread of an infectious disease like COVID-19 within a jail ultimately results in adverse public health outcomes for the broader community and region.

As a result, reducing prison populations does not just benefit detainees and correctional staff, it also benefits the community as a whole by reducing the burden on healthcare resources that are already in high demand. In the face of the current crisis, correctional systems around the country and the world, including New York City, have announced efforts to reduce their detained populations. Many of these jurisdictions are focusing their release efforts on individuals classified as high-risk. These jurisdictions include Los Angeles County, CA, Cook County, IL, a county in Ohio, Hennepin County, MN, and San Francisco, CA. 37. Despite the consensus in the medical community about the need to reduce population size to improve outcomes for public health and safety, and in sharp contrast to the efforts of jurisdictions around the United States to comply with such recommendations, ICE recently announced that it has no plans to release individuals as a COVID-19 risk mitigation strategy. The Risks to Plaintiffs' Health are Particularly Acute in the Jails Where ICE is Detaining Them.  The New York-area jails where the plaintiffs are detained—Bergen County Jail, Hudson County Correctional Facility, Essex County Jail, and Orange County Jail—are especially vulnerable to rapid transmission of COVID-19 because of the unsanitary and hazardous conditions within the facilities and their history of providing poor treatment. As a result, the irreparable harm Plaintiffs will suffer once the virus reaches them is imminent.

The Bergen County Jail reported that a staff member had tested positive for COVID-19. There were also a confirmed case of a staff member in the medical unit contracting COVID-19 in at the Elizabeth Detention Center, another ICE detention facility in New Jersey. And other non-immigration facilities in the New York area,

including Rikers Island, are reporting confirmed COVID-19 cases among both staff and detainees.  ICE detainees at all four jails have also reported that conditions have deteriorated in recent days as the facilities take ad hoc, medically inadvisable and insufficient measures to try to contain the likelihood of transmission, including by widespread and arbitrary use of solitary confinement at Hudson, Orange and Bergen County Jails.  Detainees currently held at the facilities also describe insufficient hand soap, no hand sanitizer, and no access to cleaning supplies, and previously reported at times being deprived of toilet paper. Some detainees also report that jail officials have forbidden them from flushing toilets frequently, which adds to unsanitary conditions. Attorneys who recently visited the jails confirmed that there was a lack of hand soap in the visitors' bathrooms, meaning that visitors would carry in whatever germs they entered the facility with.  Further contributing to the elevated risk of harm is these jails' track record of failure to provide adequate and prompt medical care even before the current pandemic.

Examples of inadequate care at these specific facilities includes a history of denial of vital medical treatment such as dialysis and blood transfusions; subjecting detainees in need of surgeries to unconscionable delays; altering established treatment regimens; failing to provide necessary mental health services; overuse of solitary confinement; and ignoring repeated requests for care from detainees with serious symptoms.

These deficiencies in medical treatment have placed individuals at risk of strokes, heart attacks, renal failure, amputation, life-threatening heart conditions, kidney failure, and blindness. Last year, a mumps outbreak at Bergen County Jail resulted in the

quarantine of dozens of immigration detainees for several weeks. The Department of Homeland Security's own Office of the Inspector General also recently reported on the substandard care, long waits for medical care and hygiene products, and mistreatment in ICE detention facilities.  In light of their failure to provide consistent access to basic hygiene and adequate health care even under normal circumstances, it appears unlikely that ICE's New York City-area jails will be able to competently and safely respond to the COVID-19 pandemic. The COVID-19 Pandemic Presents a Grave Risk of Harm, Including Serious Illness and Death to the Elderly and Those with Certain Medical Conditions COVID-19 can lead to respiratory failure, kidney failure, and death. Older patients and those with chronic underlying conditions are at a particularly high risk for severe cases and complications. Underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age include blood disorders, chronic kidney or liver disease, immunosuppression, endocrine disorders (including diabetes), metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy. The need for intensive care and the likelihood of death is much higher from COVID-19 than from influenza.

Complications from COVID-19, including severe damage to lungs, heart, liver, or other organs, can manifest at an alarming pace and serious deterioration can occur in a matter of days. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza.  Preliminary data from China showed serious illness, sometimes resulting in death, occurs in up to 16% of cases, with a higher rate among those older and high-risk individuals.  Those in high-risk

categories who do not die may have prolonged serious illness requiring hospital care, including ventilators that will likely be in very short supply, and a team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. Patients who do not die from serious cases of COVID-19 may face prolonged recovery, including rehabilitation from neurological damage and loss of respiratory capacity.

### *Petitioner Is At Heightened Risk Of Infection*

The psychological trauma associated with being imprisoned indefinitely is heightened when you take into account the uncertainty of not knowing whether you will contract COVID-19 and die while detained.

Upon being detained, Petitioner was served with a notice that she is at heightened risk of death from COVD-19 infection. She was not given any psychological counseling and she was provided no explanation for this finding. Instead, she was placed in solitary confinement "for her safety" for weeks and was only allowed to leave her cell for one hour a day.

The Government failed to consider this classification and the Court never incorporated this into their assessment. In light of this it is submitted that the continued detention of Ms. Anna Sorokin poses an unconstitutional threat to her health safety and well-being and thus the relief prayed for here is warranted.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION
### FIRST CLAIM

**Violation of the Right to Substantive Due Process**

1.   Respondents' conduct violates Petitioner's right to substantive due process under the Fifth Amendment of the United States Constitution.

2.   Respondents' conduct violates Petitioner's right to substantive due process under the Fourteenth Amendment of the United States Constitution.

## SECOND CLAIM

**Violation of the Right to Procedural Due Process**

3.   Respondents' conduct violates Petitioners' right to procedural due process under the Fifth Amendment of the United States Constitution.

4.   Respondents' conduct violates Petitioner's right to procedural due process under the Fourteenth Amendment of the United States Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner prays that this Court grant the following relief:

1)   Assume jurisdiction over this matter; and

2)   Issue an order directing Respondents to immediately release Petitioner from custody on her own recognizance or on reasonable conditions of supervision; and or

3)   In the alternative, issue an order requiring Respondents to provide Petitioner with constitutionally adequate, individualized hearings within 48 hours at which the Department of Homeland Security bears the burden of establishing by clear and convincing evidence that continued detention is justified in light of the grave risks

to Petitioner's health and well-being in ICE custody, and at which Petitioner's vulnerability to COVID-19 is weighed as a factor in determining suitability for release; and at which ability to pay and alternative conditions of release are considered, or to immediately release Plaintiffs; and

4)   Award reasonable attorneys' fees and costs for this action; and

5)   Grant any other and further relief that this Court deems just and proper.


Dated:  Queens, NY
         August 4, 2021

                        Respectfully submitted,


                        _____
                        AUDREY A. THOMAS, ESQ.
                        (Part 130 Certification – ID#: 4050548)
                        The Law Office of Audrey Thomas PLLC
                        *Attorney for Petitioner*
                        245-07 Francis Lewis Blvd
                        Rosedale, NY 11422
                        718-276-2729(ph) 718-276-0196(fx)
                        audreythomasesq@gmail.com