**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANNA SOROKIN, | Civil File No. 1:21-cv-06588-JMF |
| Petitioner, | |
| v. | |
| CARL E. DUBOIS, Orange County Sheriff; TOM DECKER, Field Office Director, Immigration and Customs Enforcement; TAE JOHNSON, Director, Immigration and Customs Enforcement; ALEJANDRO MAYORKAS, Secretary of the Department of Homeland Security; and  MERRICK GARLAND, Attorney General of the United States. | <u>**AMENDED PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2241**</u> |
| Respondents. | |

## <u>INTRODUCTION</u>

1. Petitioner Anna Sorokin is a 30-year German Citizen who has been detained by federal immigration officials since on or about March 25, 2021, without an opportunity for a bond determination. On September 25, 2021, Petitioner will have remained in Respondent's custody for six months and will likely remain much longer as her case is currently on appeal.

2.  She petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. The Department of Homeland Security has detained Anna Sorokin not as a result of her criminal convictions but due to the fact that she remained in the United States past the period of her authorized stay after entering via the Visa Waiver Program.

3. Petitioner's detention serves no purpose as she is not a flight risk and does not pose a danger to the public. Demore v. Kim, 538 U.S. 510, 532-33 (2003)

4. Petitioner respectfully requests that this Honorable Court order her immediate release or, in the alternative, conduct its own custody hearing or order Respondents to provide her with a bond hearing where the government bears the burden of showing by clear and convincing evidence that Petitioner is a flight risk or danger to the community, and at which the court must consider her ability to pay and the availability of alternatives to detention.

5. All statements made above and below herein are made upon information and belief and are based on my conversations with Petitioner's trial counsel Todd Spodek, conversations with Petitioner, a review of documents contained in the files maintained by this office, a review of Petitioner's Criminal Court file from New York County, and a review of documents presented to our offices by Petitioner, and conversations with family members and friends of Petitioner and based on all prior proceedings held before the Immigration Judge in New York County, the Supreme Court Judge in New York County Criminal Division, the proceedings held in the Appellate Division First Department New York, County and all prior proceeding filed with the Board of Immigration Appeals.

6. There was no prior application made by this office on Petitioner's behalf

7. for the relief sought herein.  However, the petitioner has filed at least two prior applications for bond and an appeal of the Immigration Judge's decision denying bond.

## PARTIES

### A.   Petitioner

8.  Anna Sorokin, was born in Russia and she entered the USA Lawfully under ESTA as
    she is a citizen of Germany.  She is detained by the Respondent at Orange County
    Jail.

### B.   Respondents

9.  Respondents CARL E. DUBOIS, is named in his official Capacity  named in his
    official capacity as the Sheriff of Orange County, New York. In that capacity, Sheriff
    Carle E. Dubois is responsible for the Orange County Jail, a detention facility under
    contract with Immigration and Customs Enforcement ("ICE") and the physical
    location where Ms. Anna Sorokin has been in custody since on or about March 25,
    2021. The address for Orange County Jail is 110 Wells Farm Road, Goshen, NY
    10924.

10. Respondent TOM DECKER, is named in his official capacity as the Field Office
    Director for the New York Field Office for ICE within the United States Department
    of Homeland Security ("DHS") for New York. In that capacity, Field Director Decker
    has supervisory authority over the ICE agents responsible for making the initial
    custody decision regarding Ms. Anna Sorokin.  The address for the St. Paul Field
    Office is 26 Federal Plaza, New York, NY 10278.

11. Respondent TAE JOHNSON, is sued in his capacity as the Director, Immigration and
    Customs Enforcement within DHS, located in Washington, D.C. In that capacity,
    Director Johnson has supervisory capacity over ICE personnel in New York, and he is

the head of the agency that retains legal custody of Ms. Sorokin. The address for ICE Headquarters is 500 12th St. SW, Washington, D.C. 20536.

12. Respondent ALEJANDRO MAYORKAS, is sued in his capacity as the Secretary of the Department of Homeland Security.  In this capacity, Secretary Mayorkas is responsible for the administration of the immigration laws pursuant to § 103(a) of the Immigration and Naturalization Act ("INA"), 8 U.S.C. § 1103(a) (2007), routinely transacts business in the Southern District of New York, supervises Field Director Johnson, is legally responsible for pursuing Ms. Sorokin's detention and removal, and as such is Ms. Sorokin's legal custodian. Secretary Mayorkas' address is U.S. Department of Homeland Security, Washington, D.C. 20528.

13. Respondent  MERRICK GARLAND, Attorney General of the United States, is sued in his official capacity as the Attorney General of the United States. In this capacity, he is responsible for the administration of the immigration laws as exercised by the Executive Office for Immigration Review, pursuant to 8 U.S.C. § 1103(g). He routinely transacts business in the Southern District of New York, is legally responsible for administering Ms. Sorokin's removal proceedings and the standards used in those proceedings, and as such is Ms. Sorokin's legal custodian. Attorney General Garland's address is U.S. Department of Justice, 950 Pennsylvania Ave. NW, Washington, D.C. 20530.

## JURISDICTION

14. Ms. Anna Sorokin is detained in the custody of Respondents in Goshen, New York which lies in the Southern District of New York. This Court has subject matter jurisdiction over this Petition pursuant to 28 U.S.C. § 2241, 28 U.S.C § 1331, and Article I, § 9, cl. 2 of the United States Constitution; the All Writs Act, 28 U.S.C § 1651; the Administrative Procedure Act, 5 U.S.C. § 701; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

15. Ms. Anna Sorokin's current detention as enforced by Respondents constitutes a "severe restraint on her individual liberty," such that Ms. Anna Sorokin is "in custody" in violation of the laws of the United States. See Hensley v. Municipal Court, 411 U.S. 345, 351 (1973). While the circuit courts of appeals have jurisdiction to review removal orders directly though petitions for review, see 8 U.S.C. § 1252(a)(1), (b), the federal district courts have jurisdiction to determine the legality of an individual's detention by ICE. See, e.g., Demore v. Kim, 538 U.S. 510, 516-17 (2003); Zadvydas v. Davis, 533 U.S. 678, 687 (2001).

## VENUE

16. This case is properly brought in the Southern District of the State of New York pursuant to 28 U.S.C. § 2241(d) and 28 U.S.C. § 1391(b)(2). Petitioner is detained in Goshen, New York which is located within the Southern District, under the authority of Respondent Tom Deceker and in the physical custody of Sheriff Carl E. Dubois. Both Respondents are located within the authority of this Court. Petitioner was

subject to proceedings held at 201 Varick Street, New York, NY. Petitioner resided in the Southern District prior to her detention.

## <u>EXHAUSTION OF ADMINISTRATIVE REMEDIES</u>

17. Ms. Anna Sorokin has no administrative remedy to address the claims raised in this Petition, and even if there were administrative remedies which could provide relief, exhaustion would be futile.

18. Ms. Anna Sorokin claims that her detention is unconstitutional and is being enforced based on her conviction which is on direct appeal and thus the Immigration Judge has jurisdiction to hear her case. Matter Of Armando Cerda Reyes, 26 I&N Dec. 528 (BIA 2015).  The Immigration Judge has agreed with the DHS that the IJ has no jurisdiction to consider bond as Petitioner is held pursuant a visa waiver overstay. This decision has been appealed to the Board of Immigration Appeals.

19. It is submitted that the BIA would apply these same precedents as dispositive of Ms. Sorokin's claims and thus, although Ms. Sorokin has filed two appeals with the BIA, an administrative appeal would be futile. See Monestime v. Reilly, 704 F. Supp. 2d 453, 456-57 (S.D.N.Y. 2010).  Furthermore, Ms. Sorokin challenges her unlawful detention that has lasted over five months and should not be required as a prudential matter to endure additional time detained while awaiting BIA review.

20.    Respondents initially allowed Petitioner to remain at liberty after her release from the New York State Department of Corrections, now Respondents have denied Petitioner's application for a stay or removal and will not release her from custody under the theory that she is a danger to the community.

21. Ms. Sorokin has been seeking relief from the date she was taken into custody on March 25, 2021 and continues to pursue release to date.

22. Moreover, this issue would not bar Ms. Sorokin's pursuit of the instant writ as the agency predetermined the issues here in their administrative order of removal and Ms. Sorokin does not need to exhaust applications for relief to pursue her writ.   Garcia v. Shanahan, 615 F.Supp.2d 175, 179–80 (S.D.N.Y.2009); Rianto v. Holder, No. CV-11-0137-PHX-FJM, 2011 WL 3489613, at *3 (D. Ariz. Aug. 9, 2011) (28 U.S.C. § 2241 does not specifically require petitioners to exhaust direct appeals before seeking habeas relief); see generally Cisneros v. Napolitano, No. 13-700 (JNE/JJK), 2013 WL 3353939, at *3 (D. Minn. July 3, 2013) (addressing habeas claim without discussing administrative exhaustion).  Exhaustion is also not required if it would be futile. Pastor–Camarena v. Smith, 977 F. Supp. 1415, 1417 (W.D. Wash. 1997); Duy Tho Hy v. Gillen, 588 F.Supp.2d 122, 125–26 (D.Mass.2008) (holding that exhaustion of administrative remedies is not required "where the agency has predetermined the issue before it").

## STATEMENT OF FACTS

**Petitioner's Background**

23. Petitioner is a white female and a native of Russia and citizen of Germany. The Petitioner does not have any children and she has never been married. Petitioner most recently came to the United States in 2017 under ESTA.

**Petitioner's Arrest and Conviction**

24. Petitioner was arrested, detained at Riker's Island, charged, tried and convicted of the following offenses:

    a)    ATTEMPTED GRAND LARCENY IN THE FIRST DEGREE PL SECTION 110/155.42; AND

    b)    TWO COUNTS OF GRAND LARCENY IN THE SECOND DEGREE UNDER PENAL LAW SECTION 155.40(1); AND

    c)    GRAND LARCENY IN THE THIRD DEGREE UNDER PENAL LAW SECTION 155.35(1) AND

    d)    THREE COUNTS OF THEFT OF SERVICES UNDER PENAL LAW SECTION 165.15(3); AND

    e)    THEFT OF SERVICES UNDER PENAL LAW 165.15(2)

25. Petitioner's Criminal Case is on Direct appeal with the Supreme Court of the State of New York: Appellate Division First Department.

26. The Petitioner was released from prison on February 12, 2021 and was

27. being supervised by the New York State Department of Parole pursuant to

28. an order of the Honorable Justice Kiesel sentencing her to four (4) to twelve

29. (12) years in prison after she was convicted at trial. On the day of her release, Petitioner was granted supervised release by DHS and served with a Notice of Intent to issue a final order of administrative removal.

30. After being convicted, the Petitioner secured contracts with Netflix, RTL,

31. Info Network, and others to sell her story. Justice Kiesel ordered the Defendant to pay restitution to the judgment creditors that were named in the criminal case against the defendant totaling approximately $200,000.00.

32. The Petitioner was granted early release by the Board of Parole for she displayed exceptional qualities as an inmate at Albion Correctional Facility where she was

housed for three years during her sentence. The Petitioner has paid all restitution ordered by the Honorable Justice Kiesel.

33. The Petitioner has a host of friends in the United States who are standing with her and providing support and assistance to Petitioner.  The Petitioner is working on a bail reform project and is actively trying to be a positive example of how the United States provides full and fair opportunities to turn one's trials and tribulations into opportunities to make a difference.

34. Petitioner filed an application to extend her stay and the same is pending before USCIS.  Prior to this the Petitioner filed an I589 application because Petitioner claims to have a valid claim for asylum as she has a credible fear of returning to Germany.

**Administrative Removal**

35. The Petitioner was served with a Visa Waiver Program Notice of Intent to Issue A Final Administrative Removal Order on February 09, 2021.

36. The Petitioner was not detained by ICE and was allowed to remain at liberty via an order of supervision dated February 9, 2021.

37. The Petitioner reported to ICE at 26 Federal Plaza, New York NY where she as detained on or about March 25, 2021 after agents served her with a notice of a final order of deportation based on the claim that Respondent overstayed her terms of entry pursuant to ESTA.

38. The Visa Waiver Program Administrative Removal Order is dated February 09, 2021 but was not served until March 25, 2021.

39. Petitioner was not given a reason as to why the Order of supervision was rescinded and why she has not been released in the subsequent months.

**Immigration Court Proceedings**

40. Petitioner filed an I589 application and the Immigration and Customs Enforcement (ICE) served her with notice of a court date for April 6, 2021 before the Immigration Judge at 201 Varick Street, New York NY.

41. On April 6, 2021, the Petitioner appeared in Immigration Court and requested that she be released from custody. The Immigration Court, without authority, held a bond hearing, ultimately denying the respondent bond pursuant to INA § 236(a) because she failed to establish that she is not a danger to the community. The respondent reserved her right to appeal the April 6th Order and submitted her NOA to the Board on or after April 13, 2021. By that time, however, the Immigration Court had already vacated the April 6th Order by issuing the April 8th Order after the Department submitted a motion to reconsider the decision due to lack of the court's authority.

42. The Government further argued that the Immigration Judge properly vacated his April 6th Order because he did not have the authority to redetermine the Petitioner's custody determination. See Matter of A-W-, 25 I&N Dec. 45 (BIA 2009). Thus, the Government maintains to date that Department's detention authority with respect to the Petitioner who is removable as a VWP violator is pursuant to INA § 217(c)(2)(E); this section does not confer authority on the Attorney General to review the Department's custody determination. See INA § 217(c)(2)(E); Matter of A-W-, 25 I&N Dec. At 47.

43. The Government stressed their claim that the authority to detain a noncitizen who is removable for violating the VWP and who seeks asylum was transferred to the

44. Department from the Attorney General by the Homeland Security Act of 2002, Pub.L. No. 107-296, 116 Stat.235. See Matter of A-W-. 25 I&N Dec. at 47-48. Based on this delegation, the Immigration Judge lacked authority to hold a bond hearing to redetermine the Petitioner's custody status. See id. (The Immigration Court did not have authority to review the custody status of a VWP overstay who was in asylum-only proceedings).

45. The Government argued that the Petitioner is a VWP violator and is not in removal proceedings pursuant to the filing of an arrest warrant and the issuance of a NTA and thus, the Immigration Court properly vacated its April 6th Order for lack of authority.

46. The Government has not addressed any of the issues pertinent to the question of continued detention such as whether service of the final order of removal was actually properly effectuated and or whether the direct appeal and pending USCIS application to extend the Petitioner's time to remain in the USA are dispositive.

47. An Individual hearing was held on My 20, 2021 where the Immigration Judge ordered that a hearing on the merits of Petitioner's application would take place despite counsels request for a continuance.

48. The Judge Denied Petitioners application and ordered that she be removed to Germany.

49. Petitioner has appealed this decision to the Board of Immigration appeals. The deadline to file the appropriate brief is September 8, 2021.

**Petitioner's lengthy and indefinite detention**

50. Ms. Sorokin was first detained at 26 Federal Plaza, New York NY on or about March 25, 2021 and was subsequently transported to Bergen County jail in New Jersey, then to Orange County jail in New York where she is currently detained.

51. This detention has affected her psychological and emotional health in that she was subjected to 23 hours a day in solitary confinement having only one hour each day to leave her cell.  This affected Ms. Sorokin and cause her to have moments of non-stop crying and led to insomnia.  This detention has led to a situation of stress for Ms. Sorokin which is not surprising as it is well settled that civil detention of indefinite duration can cause "severe and chronic states of stress, helplessness, hopelessness, depression, anxiety and dread." Physicians for Human Rights, Punishment Before Justice: Indefinite Detention in the US 9-10, 27-30 (2011) (available at https://s3.amazonaws.com/PHR_Reports/indefinite-detention-june2011.pdf.

52. It is submitted that the deleterious effects of prolonged detention are magnified for those who have experienced trauma.  (Id.) Moreover, solitary confinement, which "is often used as a management tool for individuals with mental illness," has "disastrous psychological and physiological consequences," and often exacerbates mental illness. Nat'l Immigrant Justice Ctr. & Physicians for Human Rights, Invisible in Isolation: The Use of Segregation and Solitary Confinement During Immigration Detention 12-14 (2012) (available at https://s3.amazonaws.com/PHR_Reports/Invisible-in-Isolation-Sep2012-detention.pdf.

53. It is submitted that to subject Ms. Sorokin to continued detention as the issues with COVID-19 continues to rise, is tantamount to cruel and inhuman treatment as Ms. Sorokin has not done anything to warrant the extreme steps being pursued here in furtherance of her detention.

**Planning for Petitioner's Release**

54. It is respectfully submitted that there are less restrictive and more humane ways to further the goals of the Government.

55. For example, Anna Sorokin has a curfew and was required to report to the Department of Probation in New York County on a weekly basis.  She was not allowed to open any bank accounts and all financial transactions she is party to are funneled through her attorney's IOLA account so that the records are readily available for inspection upon demand.  Ms. Anna Sorokin's residence is approved by the Parole Board and she has surrendered her passport to ICE.

56. Ms. Sorokin could be released with an ankle bracelet, she could be restricted in the access she enjoys with social media or any other limitations that the Government may believe will protect the public from the threats they claim she poses.

57. More importantly, the Government can further their goals via adherence to the stringent restrictions the Parole Board fostered for the next 10 years as the Petitioner's parole does not end for the next ten years.

58. The Petitioner will not be a burden to the State as she has very lucrative contracts with NetFlix and other well established media groups.  Therefore, she will be self-sustaining for the entirety of her presence in the USA.

59. She has a place to live and means of providing for herself and her business ventures will actually provide jobs for Americans.  Ms. Sorokin has already provided for several people's financial security.  She has paid out over $75,000 in legal fees, and has hired camera men/women, videographers, photographers, and a team of American media personnel.  Her bail reform venture has already called to attention several activists who are eager to work with her. Her concerns about the conditions many inmates face has not fallen on deaf ears.  The Department of Corrections has actually launched an investigation into the concerns.

60. Ms. Anna Sorokin is truly a force of change that Americans can believe in and a source of inspiration for those who have fallen to believe they can get back up again.

## **LEGAL BACKGROUND**

## I.     **STATUTORY FRAMEWORK**

61. The statutory authority for detention during removal proceedings before a final order of removal is issued is 8 U.S.C. § 1226. Section 1226, in turn, consists of two main subsections: § 1226(a) and § 1226(c). The text of § 1226(a), the general statute authorizing detention of noncitizens, reads in pertinent part:

> (a) Arrest, detention, and release
>
> On a warrant issued by the Attorney General, an alien may be arrested and detained *pending a decision on whether the alien is to be removed from the United States*. Except as provided in subsection (c) of this section and pending such decision, the Attorney General--
>
> > (1) may continue to detain the arrested alien; and
> >
> > (2) may release the alien on--

> (A) bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or
>
> (B) conditional parole

8 U.S.C. § 1226(a) (emphasis added).

62. Section (b) then provides that "[t]he Attorney General at any time may revoke a bond or parole authorized under subsection (a) of this section, re-arrest the alien under the original warrant, and detain the alien." 8 U.S.C. § 1226(b) (emphasis added).

63. Section (c)(1) describes a limited subset of detained noncitizens who are subject to mandatory detention, rather than the discretionary detention of section (a). It reads:

> (1) Custody
>
> The Attorney General *shall take into custody any alien* who—
>
>> (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title,
>>
>> (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title,
>>
>> (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or
>>
>> (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title,
>
> when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense.

8 U.S.C. § 1226(c)(1) (emphasis added).

64. Under § 1226(a), a detained noncitizen is entitled to an individualized review of risk of flight and dangerousness to the community, in the form of a bond hearing.

However, a noncitizen detained under § 1226(c) is not entitled to any opportunity to seek bond, and is instead mandatorily detained for the duration of their immigration proceedings. In other words, § 1226(a) is the broad, authorizing provision that allows for the discretionary detention of any noncitizen pending removal proceedings on an individualized basis, and § 1226(c) sets out an exception to the "general rule that allows bond hearings." Sylvain v. Attorney Gen. of U.S., 714 F.3d 150, 153 (3d Cir. 2013). This exception prescribes a categorical detention regime applicable only to a limited sub-class of detainees.

## II.   8 U.S.C. § 1226(c) DOES NOT AUTHORIZE PROLONGED MANDATORY DETENTION

65.   Ms. Anna Sorokin's detention for over five months without a bond hearing is an egregious violation of the Fifth Amendment's guarantee that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."

66. This is especially true considering the fact that COVID-19 has taken the lives of over 600,000 Americans to date and continues to threaten the health, safety and well-being of everyone forced to share close quarters with countless others.

67. Recognizing that the prolonged detention of noncitizens would raise serious due process concerns, the four circuits that have addressed the question have all agreed that § 1226(c) contains an implicit 'reasonableness' limit, after which individualized review or release is required. Lora v. Shanahan, 804 F.3d 601 (2d Cir. 2015); Rodriguez v. Robbins, 715 F.3d 1127 (9th Cir. 2013) ("Rodriguez II"); Diop v.

ICE/Homeland Sec., 656 F.3d 221 (3d Cir. 2011); Ly v. Hansen, 351 F.3d 263 (6th Cir. 2003).

68. It is submitted that the detention of a person who has already withstood the stringent process of parole board review successfully based on a claim of dangerousness is oxymoronic and violative of all principles of res judicata that this court should be bound by.

69. There is no question that five months in COVID-19 America far exceeds any measure of reasonableness, so Ms. Sorokin should be entitled to habeas relief.

70. In order to determine whether no-bond detention has become unreasonable, courts have employed either a six-month bright-line test or a multi-factor test. Compare Lora, 804 F.3d at 614-16 (six-month bright-line test) and Rodriguez II, 715 F.3d at 1138-39 (same), with Chavez-Alvarez v. Warden York Cty. Prison, 783 F.3d 469, 473-75 (3d Cir. 2015) (multi-factor test) and Ly, 351 F.3d at 271-73 (same). As discussed below, Part B, this Court should apply the six-month bright-line test, under which a noncitizen is entitled to an automatic bond hearing after six months of § 1226(c) detention, because this test is supported by Supreme Court due process precedent, is more practical, will conserve judicial resources and the resources of the parties, and will better and more consistently protect individuals' core constitutional rights.

71. Under this test, it is submitted that the Court's refusal to grant the bond hearing requested by Ms. Sorokin is unconstitutional.  Ms. Sorokin was due a bond hearing with constitutionally sufficient procedural protections the moment she raised the issue

that no proper service of the administrative order was made and pointed out that the

proof of service states Petitioner was served in Batavia NY and Petitioner was

detained at Albion Correctional and thus service in Batavia would have been

impossible. See Rodriguez II, 715 F.3d at 1138-39.

72. It is submitted that even if this Court elects instead to follow a multi-factor

reasonableness test, the Court should still find that Ms. Sorokin's detention has

exceeded the bounds of reasonableness, and therefore due process requires a bond

hearing "at which the Government bears the burden of proving that continued

detention is necessary to fulfill the purposes of the detention statute," namely,

preventing flight and danger to the community. Diop, 656 F.3d at 233; see also Ly,

351 F.3d at 273 (applying the multi-factor test and placing the burden on the

government to show that detention prevents flight or danger to the community).

A. **Because Prolonged Detention Under § 1226(c) Raises Due Process Concerns, § 1226(c) Must Be Construed to Authorize No-Bond Mandatory Detention for Only a 'Reasonable' Duration**

73. "Freedom from imprisonment—from government custody, detention, or other forms

of physical restraint—lies at the heart of the liberty that [the Due Process] Clause

protects." Zadvydas 533 U.S. at 690. It is "well established" that the Fifth

Amendment's Due Process Clause protects detained noncitizens like Ms. Sorokin

from unconstitutional deprivations of liberty when in deportation proceedings.

Demore, 538 U.S. at 523 (internal citations omitted). The Supreme Court "repeatedly

has recognized that civil commitment for any purpose constitutes a significant

deprivation of liberty that requires due process protection." Addington v. Texas, 441

U.S. 418, 425 (1979) (emphasis added). Additionally, the Court has long held that civil detention is unconstitutional absent a sufficient justification and strong procedural protections. See generally, e.g., Zadvydas, 533 U.S. at 690; Foucha v. Louisiana, 504 U.S. 71, 80–83 (1992); United States v. Salerno, 481 U.S. 739 (1987); Addington, 441 U.S. at 425–27, 433; Jackson v. Indiana, 406 U.S. 715 (1972). Moreover, as detention grows in length, the justification for the increasingly severe deprivation of individual liberty must also grow stronger. See, e.g., Kansas v. Hendricks, 521 U.S. 346, 363-64 (1997); see also Chavez-Alvarez, 783 F.3d at 474 (citing Diop, 656 F.3d at 232, 234); Casas-Castrillon v. Dep't of Homeland Sec., 535 F.3d 942, 950 (9th Cir. 2008).

74. The Supreme Court has applied the canon of constitutional avoidance to preclude prolonged categorical detention without individualized review in the context of post-removal period detention under 8 U.S.C. § 1231(a)(6). In Zadvydas v. Davis, the Supreme Court held that post-removal period detention under § 1231(a)(6), like other "nonpunitive" civil detention, is subject to due process limitations. 533 U.S. at 690-92, 696-700. Applying the canon of constitutional avoidance, the Supreme Court limited detention under § 1231(a)(6) without an individualized justification to a presumptively reasonable period of six months—the time "reasonably necessary" to ensure removal—even though § 1231(a)(6) is silent on the length of detention it authorizes. Id. at 689, 697-98. After the six-month period has passed, noncitizens can demand that the government justify their continued detention on an individual basis.

Id. at 689 (explaining that courts must construe statutes to avoid constitutional concerns where "fairly possible").

75. Like § 1231(a)(6), § 1226(c) contains no express temporal limitation on the length of mandatory detention; however, § 1226(c) detention without bond should be similarly limited to a reasonable period. The Supreme Court has never addressed whether no-bond detention under COVID-19 conditions would violate the constitution, but all of the circuit courts addressing the issue have ruled that prolonged no-bond detention under § 1226(c) raises serious due process concerns and have ordered either a bond hearing or immediate release when detention becomes prolonged.

76. In the Second and Ninth Circuits, mandatory detention under § 1226(c) is "presumptively prolonged," and thus "'constitutionally doubtful'" when it "surpasses six months in duration." Rodriguez II, 715 F.3d at 1136-1137, 1139 (affirming an order for bond hearings for § 1226(c) detainees held longer than six months) (quoting Casas-Castrillon, 535 F.3d at 951); see also Lora, 804 F.3d at 606 n.11, 614-16 (adopting the six-month bright-line rule in use in the Ninth Circuit and affirming an order for a bond hearing for an individual detained under § 1226(c) based on the fact that he was detained for five-and-a-half months before being released on bond and "it [wa]s certain that, were he to be returned to custody, his total period of detention would exceed six months"); Rodriguez v. Robbins, 804 F.3d 1060, 1080-81 (9th Cir. 2015) ("Rodriguez III") (reiterating the holding in Rodriguez II that individuals detained longer than six months pursuant to § 1226(c) are entitled to bond hearings).

77. Similarly, in Diop v. ICE/Homeland Security, the Third Circuit granted habeas relief

for a noncitizen held under § 1226(c) for thirty-five months. The court held that "the

constitutionality of [mandatory § 1226(c) detention without a bond hearing] is a

function of the length of the detention. At a certain point, continued detention

becomes unreasonable and the Executive Branch's implementation of § 1226(c)

becomes unconstitutional unless the Government . . . justifie[s] its actions at a hearing

inquiring into whether continued detention is consistent with the law's purposes of

preventing flight and dangers to the community." Diop, 656 F.3d at 232. The Third

Circuit also concluded that in enacting § 1226(c), Congress "did not intend to

authorize prolonged detention without . . . further inquiry into whether detention is

necessary." Id. at 235 (emphasis added).

78. Likewise, in Ly v. Hansen, the Sixth Circuit held that detainees may not be held under

§ 1226(c) without bond beyond the time "reasonably required to complete removal

proceedings in a timely manner." 351 F.3d at 266, 268 (affirming the district court

order for a bond hearing after one and one-half years of detention). The Ly court read

the constitutional requirement for reasonable duration as consistent with Congress's

"clear" intent that "removal proceedings [for detained criminal noncitizens] were to

proceed quickly." Id. at 269 (citing 8 U.S.C. § 1229(d)(1), which states that "[i]n the

case of an alien who is convicted of an offense which makes the alien deportable, the

Attorney General shall begin any removal proceeding as expeditiously as possible

after the date of the conviction").

79. While the Supreme Court held in Demore v. Kim that brief mandatory detention under § 1226(c) without a bond hearing did not violate due process, this holding was specifically premised upon the fact that the noncitizen had been detained for just six months, as well as evidence that, at the time, § 1226(c) detention more broadly was neither indefinite nor prolonged. 538 U.S. at 530-31; id. at 529–30 (relying on evidence that, at that time, removal proceedings were completed in an average time of forty-seven days and a median time of thirty days in 85% of cases, and that the remaining 15% of cases, in which an there is an appeal, were completed in an average of four months). Indeed, although the Demore Court upheld a narrow exception to the general civil detention rule that "liberty is the norm" absent procedural protections to ensure that detention is justified, Salerno, 481 U.S. at 755, this exception was narrowly tailored to the relatively brief period at issue in Demore. Id. at 513, 523, 527–29; see also Lora, 804 F.3d at 614 ("[I]n Demore v. Kim, [the Supreme Court] emphasized that, for detention under the statute to be reasonable, it must be for a brief period of time."); Ly, 351 F.3d at 276–77 (Judge Haynes, concurring in part and dissenting in part).

80. As the crucial fifth vote in Demore, Justice Kennedy acknowledged in his concurrence that "if continued detention bec[omes] unreasonable or unjustified," a noncitizen could be "entitled to an individualized determination as to his risk of flight and dangerousness." 538 U.S. at 532 (Kennedy, J., concurring); see also id. at 532-33 ("Were there to be an unreasonable delay by the INS in pursuing and completing deportation proceedings, it could become necessary then to inquire whether the

detention is not to facilitate deportation, or to protect against risk of flight or dangerousness, but to incarcerate for other reasons."); Lora, 804 F.3d at 614; Rodriguez II, 715 F.3d at 1137.

81.  Since Demore, "the time that each immigrant spends in detention has . . . risen substantially." Lora, 804 F.3d at 604-05. Circuit courts now rely on the six months of detention at issue in Demore as a touchstone for determining whether no-bond detention under § 1226(c) has become unreasonably prolonged. See, e.g., Rodriguez III, 804 F.3d at 1068 ("[T]he Court's holding in Demore turned on the brevity of mandatory detention under § 1226(c) . . . ."); Chavez-Alvarez, 783 F.3d at 474, 477-78 (holding that detention became unreasonable at some point between six months and one year of detention and noting that "the Court in Demore expected the detentions under section 1226(c) to be brief, and . . . this expectation was key to their conclusion that the law complied with due process."); Rodriguez II, 715 F.3d at 1137 ("[W]e have consistently held that Demore's holding is limited to detentions of brief duration."); Diop, 656 F.3d at 234 (explaining that mandatory detention becomes more constitutionally "suspect" as it extends beyond the brief detention periods considered by the Supreme Court in Demore).

82. This Court has agreed that imposing a reasonable time limit on § 1226(c) detention "saves the statute from constitutional challenge." Ly, 351 F.3d at 270.

**No-Bond Detention Under § 1226(c) Is Unreasonably Prolonged After Six Months**

83. In determining whether § 1226(c) detention has become unreasonably prolonged, courts in this district have overwhelmingly adopted the Sajous five-factor approach. See. Doe v Decker No. 20 Civ 4232, Dukuray v. Decker, No. 18 Civ. 2898(VB), 2018 WL 5292130, at 3-4 (S.D.N.Y. Oct. 25, 2018)

84. Under this test the Courts consider (1) the length of Detention; (2) whether the Petitioner is responsible for the delay; (3) The Petitioner's Defense to Removal; (4) Petitioner's criminal history; and (5) The difference between Petitioner's current facility and a penal institution for criminal detention.

85. Under this standard, "[t]he first, and most important, factor . . . is the length of time the alien has already been detained." Sajous, 2018 WL 2357266 at 10. Courts in this District have largely agreed that detention without an individualized bond hearing for "longer than six months is more likely to be `unreasonable,' and thus contrary to due process, than detention of less than six months." Sajous, 2018 WL 2357266, at *10

86. Here Petitioner has been detained for nearly six months, is not the reason for the delays in her proceedings, has meritorious defenses to her removal, has a single criminal conviction and is detained in a facility identical to a Penal intuition for Criminal detention.

**B.    Ms. Sorokin's Mandatory Detention Has Become Unreasonably Prolonged**

87. Ms. Sorokin has been detained for over five months since March 25, 2021.  The Court has denied her a meaningful opportunity to challenge her detention, nor has there been

a determination that her continued detention is warranted based on flight risk and the

determination that she is a danger is in direct contrast to the Parole Board's finding

only a month prior to this determination and there was no change in circumstance that

was substantial enough to justify this view that goes against the Parole Board's

finding.

88. Under the multi-factor test, Ms. Sorokin's detention has become unreasonable, and

she is entitled to relief from this Court.

89. Ms. Sorokin has been in ICE custody since March 25, 2021. Under the six-month

rule, taking into account COVID-19 changes, Ms. Sorokin should be entitled to a

constitutionally adequate bond hearing.  Ms. Sorokin is clearly entitled to a bond

hearing where the government bears the burden of justifying her continued detention.

90. Likewise, under the multi-factored reasonableness test, Ms. Sorokin's detention is

unreasonable. The most central consideration—length of detention "beyond the

average times necessary for completion of removal proceedings which were identified

in Demore," Alli, 644 F. Supp. 2d at 543—weighs heavily in favor of release.  538

U.S. at 529; see also Araujo-Cortes, 35 F. Supp. 3d at 548, 550 (holding that detention

under § 1226(c) became unconstitutionally unreasonable under a multi-factor test

after six months of detention).

91. Second, it is highly likely that Ms. Sorokin's removal proceedings will continue for

untold months while she awaits a decision by the BIA and any subsequent appeal that

becomes necessary. Unlike the petitioner in Demore, whose detention had a "definite

termination point," 538 U.S. at 529, and who, according to the Demore majority,

"conceded . . . to being a deportable alien for whom deportation was a real and imminent probability," there is "no end in sight" for Ms. Sorokin. See Bourguignon, 667 F. Supp. 2d at 182-83.

92. Third, it is not clear that the pending immigration proceedings will ever result in Ms. Sorokin's removal. Given the fact that she is claiming asylum, and has been trying to extend her stay and most likely may secure relief either from USCIS or the Court. Flores-Powell, 677 F. Supp. 2d at 472; see also Hussain v. Mukasey, 510 F.3d 739, 743 (7th Cir. 2007) ("It would be a considerable paradox to confer a constitutional or quasi-constitutional right to release on a [noncitizen] ordered removed (Zadvydas) but not on one who might have a good defense to removal.").

93. Fourth, any unwarranted delay in this case was caused by COVID-19 issues, and other factors that are not in Petitioner's control. Furthermore, Ms. Sorokin has not engaged in dilatory tactics, and she has only pursued bona fide legal challenges to her removal. See Leslie v. Attorney Gen. of U.S., 678 F.3d 265, 271 (3d Cir. 2012) (quoting Oyedeji, 332 F. Supp. 2d at 753 (rejecting the government's argument that the noncitizen's voluntary pursuit of bona fide legal challenges to removal renders the corresponding increase in time of detention reasonable because otherwise, the noncitizen would be "effectively punish[ed] for pursuing applicable legal remedies."). Therefore, this factor weighs in favor of her release.

94. This Court must construe § 1226(c) to only authorize detention of a reasonable duration. Because in light of COVID-19 concerns, under either the six-month

presumption or the multi-factor test, Ms. Sorokin's detention has become

unreasonably prolonged, he is entitled to relief.

### C.  Because § 1226(c) Cannot Authorize Further No-Bond Detention, Ms. Sorokin Is Entitled to a Constitutionally Adequate Bond Hearing

95. The courts have authority to fashion habeas relief as the equities require. Schlup v.

Delo, 513 U.S. 298, 319 (1995); see also Flores-Powell, 677 F. Supp. 2d at 474.

Given the prolonged nature of her detention, Ms. Sorokin requests that this Court

order a constitutionally adequate bond hearing, at which the government bears the

burden of proving, by clear and convincing evidence, that Ms. Sorokin would pose a

flight risk or a danger to the community, even under supervised release. See

Rodriguez III, 804 F.3d at 1086-89 (affirming district court order of bond hearings

after six months of detention, and periodic bond hearings every six months after that,

in which immigration judges must consider alternatives to detention and the length of

past detention thus far, with the burden on the government to prove dangerousness or

flight risk by clear and convincing evidence); see also Diop, 656 F.3d at 235 (squarely

placing the burden of proving that continued detention is justified on the

government).[1]

---

[1] Courts applying a bright-line rule require an administrative bond hearing after six-months of detention. *See Rodriguez II*, 715 F.3d at 1138-39; *Lora*, 804 F.3d at 613. Under the multi-factor approach, courts order a variety of habeas relief including a bond hearing in district court or an administrative bond hearing. *See, e.g.*, *Chavez-Alvarez*, 783 F.3d  at 478 (ordering an administrative bond hearing); *Araujo-Cortes*, 35 F. Supp. 3d at 551 (ordering an administrative bond hearing, and if not completed within fourteen days, allowing the detainee to request a bond hearing in district court); *Flores-Powell*, 677 F. Supp. 2d at 479 (ordering a bond hearing in district court).

### III.   BECAUSE MS. SOROKIN HAS A SUBSTANTIAL CHALLENGE TO REMOVABILITY, HER MANDATORY DETENTION VIOLATES THE DUE PROCESS CLAUSE

96. It is submitted that placing a person who has already been determined to pose no threat to the community and who is not proven to be a flight risk in mandatory detention violates her due process rights because, unlike the detained noncitizen in Demore who conceded removability, Ms. Sorokin has substantial challenges to all alleged grounds of removability. See 538 U.S. at 513-14.

97. In Demore, Justices expressed concern that detaining noncitizens with substantial claims against removability violates due process. See Demore, 538 U.S. at 532 (Kennedy, J., concurring); id. at 577 (Breyer, J., concurring in part and dissenting in part); id. at 561 (Souter, J., dissenting) ("Some individual aliens covered by § 1226(c) have meritorious challenges to removability or claims for relief from removal. . . . As to such aliens, as with Zadvydas . . . the Government has only a weak reason under the immigration laws for detaining them.").

98. Several federal courts agree that "when a detainee who has a good-faith challenge to his deportability is mandatorily detained under § 1226(c)," his due process rights can be violated. Gonzalez v. O'Connell, 355 F.3d 1010, 1019-21 (7th Cir. 2004); see also Lora, 804 F.3d at 616 (noting, in a decision affirming a district court grant of habeas relief after prolonged detention under § 1226(c), that the petitioner was "an excellent candidate for cancellation of removal" and therefore he was a good candidate for bond); Papazoglou v. Napolitano, No. 1:12-cv-00892, 2012 WL 1570778, at *5 (N.D. Ill. May 3, 2012) (holding that a noncitizen's due process rights were violated when

he was "mandatorily detained despite the fact that he ha[d] demonstrated substantial likelihood that he w[ould] be allowed to remain in the United States and w[ould] be released from custody"); Bourguignon, 667 F. Supp. 2d at 183 & n.10 (granting habeas relief in part because, unlike in Demore, the noncitizen in Bourguignon "vigorously contest[ed] the issue of his deportability," arguing he was eligible for deferral of removal under CAT); see generally Rodriguez III, 804 F.3d at 1072 (noting that "[n]on-citizens who vigorously pursue claims for relief from removal face substantially longer detention periods than those who concede removability" and that individuals "who persevere through this lengthy process are often successful").

99. In Ms. Sorokin's case, the BIA has not reached any decision on her appeals, the Parole Board released her early finding that she is not a threat or a flight risk and she has been mandated to abide by the terms of her supervised release or face re-arrest and imprisonment for the next ten years. It is submitted that applying mandatory detention in his case violates due process because "the ultimate purpose behind [§ 1226(c)] detention is premised upon the alien's deportability," and there is a reasonable likelihood that he will never be deported. Demore, 538 U.S. at 531 (Kennedy, J., concurring).

### ***The New York Metropolitan Area is an Epicenter of the Global Pandemic***

100. On March 13, 2020, former President Trump declared a national emergency in response to the coronavirus pandemic. At the time, there were over 1,600 confirmed cases in the United States and at least 46 deaths. Today, over a year later, there are

more than 600,000 COVID related deaths and although the City recently re-opened, a

new Delta Strain threatens future closings.

101.    There has been an exponential growth in the outbreak has caused more death and

health concerns than we could have ever imagined. The New York metropolitan area

is now the epicenter of the COVID-19 in the United States with. Because the

coronavirus that causes COVID-19 is particularly contagious, authorities are took

unprecedented precautions to manage the public health crisis and minimize the

transmission of the virus by reducing the opportunity for large groups of people to

congregate. Governor Andrew Cuomo of New York ordered all non-essential workers

to stay home; New York and New Jersey banned all gatherings of more than 50

people; and New York City closed all schools, bars and restaurants.

### *The Heightened Risk of Severe Illness or Death from COVID-19 in Jails*

102.    Incarcerated persons have limited ability to take the precautionary steps that public

health experts recommend. Jail design and operations make it impossible for the

plaintiffs to engage in necessary social distancing, and they have no control over the

movements of others with whom they live in close proximity and share spaces and

resources.

103.    According to infectious disease specialist Dr. Ranit Mishori, jails, prisons, and

detention centers are settings that pose a "significantly higher" risk for the spread of

infectious diseases like COVID-19 than the general community. In China, where the

pandemic began, coronavirus suddenly exploded in prisons in early March, with 500

cases identified in five different facilities. Jails that hold pre-trial detainees, like the

ones where Plaintiffs are currently detained by ICE, are a particularly high risk setting for contagion because of their large turnover of detainees on a daily basis.

104.    The highest known person-to-person transmission rate for COVID-19 to date has taken place in settings where people are in close proximity to each other without an ability to distance themselves: in a skilled nursing home facility in Kirkland, Washington, and on cruise ships in Japan and off the coast of California.

105.    The conditions of jails such as those utilized by ICE in the New York area pose an even higher risk of the spread of COVID-19 than non-carceral locations like a nursing home or cruise ship due to their closer quarters, the proportion of vulnerable people detained, and lack of medical care resources.  Even when family or in-person legal visitation to jails is sharply curtailed, it is impossible to seal entry and exit for staff, contractors, and vendors. Detainees within such facilities thus cannot be isolated from viruses circulating in the broader community. Preventative strategies utilized by the general public, like social distancing, hand sanitizing, and proper ventilation are neither readily available nor particularly effective. As a result, rapid transmission and widespread outbreak is virtually inevitable.

106.    Once an infectious disease like COVID-19 enters a facility, there is frequently insufficient protective gear for staff and detainees, who live in close quarters and share common spaces and resources. When an outbreak occurs, jails are ill-equipped to engage in adequate containment and proper medical treatment for sick detainees. Medical experts agree that reducing the number of detainees is a necessary component of risk mitigation in a pandemic as widespread and serious as the one currently

spreading across the United States. "Not doing so is not only inadvisable but also reckless given the public health realities we now face in the United States."

107.   Any reduction in detained populations must focus on the most vulnerable detainees, in order to safeguard their health and the health of other detainees and jail staff.  As medical staff and resources within the facility becomes overwhelmed, regional hospitals and health centers end up bearing the brunt of providing healthcare for sick detainees—who are disproportionately likely to be those with pre-existing medical vulnerabilities. The rapid spread of an infectious disease like COVID-19 within a jail ultimately results in adverse public health outcomes for the broader community and region.

108.   As a result, reducing prison populations does not just benefit detainees and correctional staff, it also benefits the community as a whole by reducing the burden on healthcare resources that are already in high demand. In the face of the current crisis, correctional systems around the country and the world, including New York City, have announced efforts to reduce their detained populations. Many of these jurisdictions are focusing their release efforts on individuals classified as high-risk. These jurisdictions include Los Angeles County, CA, Cook County, IL, a county in Ohio, Hennepin County, MN, and San Francisco, CA. 37. Despite the consensus in the medical community about the need to reduce population size to improve outcomes for public health and safety, and in sharp contrast to the efforts of jurisdictions around the United States to comply with such recommendations, ICE recently announced that it has no plans to release individuals as a COVID-19 risk mitigation strategy. The

Risks to Plaintiffs' Health are Particularly Acute in the Jails Where ICE is Detaining

Them.  The New York-area jails where the plaintiffs are detained—Bergen County

Jail, Hudson County Correctional Facility, Essex County Jail, and Orange County

Jail—are especially vulnerable to rapid transmission of COVID-19 because of the

unsanitary and hazardous conditions within the facilities and their history of providing

poor treatment. As a result, the irreparable harm Plaintiffs will suffer once the virus

reaches them is imminent.

109.    The Bergen County Jail reported that a staff member had tested positive for

COVID-19. There were also a confirmed case of a staff member in the medical unit

contracting COVID-19 in at the Elizabeth Detention Center, another ICE detention

facility in New Jersey. And other non-immigration facilities in the New York area,

including Rikers Island, are reporting confirmed COVID-19 cases among both staff

and detainees.  ICE detainees at all four jails have also reported that conditions have

deteriorated in recent days as the facilities take ad hoc, medically inadvisable and

insufficient measures to try to contain the likelihood of transmission, including by

widespread and arbitrary use of solitary confinement at Hudson, Orange and Bergen

County Jails.  Detainees currently held at the facilities also describe insufficient hand

soap, no hand sanitizer, and no access to cleaning supplies, and previously reported at

times being deprived of toilet paper. Some detainees also report that jail officials have

forbidden them from flushing toilets frequently, which adds to unsanitary conditions.

Attorneys who recently visited the jails confirmed that there was a lack of hand soap

in the visitors' bathrooms, meaning that visitors would carry in whatever germs they

entered the facility with.  Further contributing to the elevated risk of harm is these jails' track record of failure to provide adequate and prompt medical care even before the current pandemic.

110.    Examples of inadequate care at these specific facilities includes a history of denial of vital medical treatment such as dialysis and blood transfusions; subjecting detainees in need of surgeries to unconscionable delays; altering established treatment regimens; failing to provide necessary mental health services; overuse of solitary confinement; and ignoring repeated requests for care from detainees with serious symptoms.

111.    These deficiencies in medical treatment have placed individuals at risk of strokes, heart attacks, renal failure, amputation, life-threatening heart conditions, kidney failure, and blindness. Last year, a mumps outbreak at Bergen County Jail resulted in the quarantine of dozens of immigration detainees for several weeks. The Department of Homeland Security's own Office of the Inspector General also recently reported on the substandard care, long waits for medical care and hygiene products, and mistreatment in ICE detention facilities.  In light of their failure to provide consistent access to basic hygiene and adequate health care even under normal circumstances, it appears unlikely that ICE's New York City-area jails will be able to competently and safely respond to the COVID-19 pandemic. The COVID-19 Pandemic Presents a Grave Risk of Harm, Including Serious Illness and Death to the Elderly and Those with Certain Medical Conditions COVID-19 can lead to respiratory failure, kidney failure, and death. Older patients and those with chronic underlying conditions are at a

particularly high risk for severe cases and complications. Underlying medical conditions that may increase the risk of serious COVID-19 for individuals of any age include blood disorders, chronic kidney or liver disease, immunosuppression, endocrine disorders (including diabetes), metabolic disorders, heart and lung disease, neurological and neurologic and neurodevelopmental conditions, and current or recent pregnancy. The need for intensive care and the likelihood of death is much higher from COVID-19 than from influenza.

112.    Complications from COVID-19, including severe damage to lungs, heart, liver, or other organs, can manifest at an alarming pace and serious deterioration can occur in a matter of days. According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza.  Preliminary data from China showed serious illness, sometimes resulting in death, occurs in up to 16% of cases, with a higher rate among those older and high-risk individuals.  Those in high-risk categories who do not die may have prolonged serious illness requiring hospital care, including ventilators that will likely be in very short supply, and a team of care providers, including 1:1 or 1:2 nurse to patient ratios, respiratory therapists, and intensive care physicians. Patients who do not die from serious cases of COVID-19 may face prolonged recovery, including rehabilitation from neurological damage and loss of respiratory capacity.

### _Petitioner Is At Heightened Risk Of Infection_

113.   The psychological trauma associated with being imprisoned indefinitely is heightened when you take into account the uncertainty of not knowing whether you will contract COVID-19 and die while detained.

114.   Upon being detained, Petitioner was served with a notice that she is at heightened risk of death from COVD-19 infection.  She was not given any psychological counseling and she was provided no explanation for this finding.  Instead, she was placed in solitary confinement "for her safety" for weeks and was only allowed to leave her cell for one hour a day.

115.   The Government failed to consider this classification and the Court never incorporated this into their assessment.  In light of this it is submitted that the continued detention of Ms. Anna Sorokin poses an unconstitutional threat to her health safety and well-being and thus the relief prayed for here is warranted.

## **CLAIMS FOR RELIEF**

### **FIRST CAUSE OF ACTION**
### **8 U.S.C. § 1226(c) IS UNCONTISTUTIONAL AS APPLIED TO ANY INDIVDUAL WHO WILL DE DETAINED MORE THAN SIX MONTH**

116.   Petitioner repeats and re-alleges paragraphs 1-115 of this petition

117.   Petitioner has now been detained for approximately 165 days without any meaningful judicial custody review.

118.   Given the liberty interest at stake the Governments authority to detain the Petitioner under § 1226(c)  must be limited to a six-month period subject to a finding

that the Petitioner is a flight risk or a danger to the community in an individualized

bond hearing.

119.    Mandatory Detention under § 1226(c) beyond six months violates due process.

## SECOND CAUSE OF ACTION

## 8 U.S.C. 1226(c) DOES NOT AUTHORIZE MANDATORY DETENTION OF PETITIOENR AS THE GOVERNMENT HAS BASED HER REMOVAL SOLELY ON HER VISA OVERSTAY

120.    Petitioner repeats and re-alleges paragraphs 1-119 of this petition

121.    8 U.S.C §1226(c) provided for mandatory detention of any individual who "is

deportable by reason of having committed any offense" enumerated in certain

segments of the Immigration and Nationality Ace. 8 U.S.C. § 1226(c)(1)(B).

122.    Mandatory detention has no place in this instance as the Government has based the

Petitioner's removal solely upon her visa overstay.

123.    For this reason, Petitioner is not properly detained under 8 U.S.C §1226(c) and

must be granted a discretionary bond hearing pursuant to 8 U.S.C §1226(a).

## THIRD CAUSE OF ACTION

### Violation of the Right to Procedural Due Process

124.    Petitioner repeats and re-alleges paragraphs 1-123 of this petition

125.    8 U.S.C §1226(c) does not permit noncitizens to be detained without bond where

no danger or flight rick can be reasonable presumed.  Demore, 538 U.S. at 535.

126.    Petitioner's detention under 8 U.S. §1226(c) is unconstitutional due to the (1)

arbitrary manner in which the statute is applied to her; (2) the length of civil

imprisonment, which will soon eclipse six months; (3) the length of time since her release from Criminal Detention; (4) the punitive and dangerous nature of her confinement in County jail which is identical to a penal institution; (5) her non frivolous applications for relief from removal, genuine attempts to provide a positive impact on the community, sole criminal conviction and the fact that the New York State Parole Board has already deemed that she is neither a flight risk or a danger to the community.

127.   Petitioner's detention is therefore unreasonable and violates the Due Process Clause.

## **FOURTH CAUSE OF ACTION**

## **8 U.S.C. § 1231 IS UNCONSTITUTIONAL AS APPLIED TO PETITIONER**

128.   Petitioner repeats and re-alleges paragraphs 1-127 of this petition

129.   In the Second Circuits decision on Hechavarria, the Court reasoned that "Section 1231assumes that the immigrant's removal is both imminent and certain" and an immigrant is only detained pursuant to §1231 if "no substantive impediments remain to the immigrant's removal. Hechavarria v Session, 891 F.3d at 55.

130.   Here, the Petitioner's removal is not imminent or certain and substantive impediments remain to her removal.

131.   The Immigration Judge Ordered removal on June 15, 2021. This decision was appealed to the BIA. The Petitioner's brief is due on or about September 8, 2021.

132.   The appeal the BIA may take months to resolve and therefore Petitioner's removal is neither imminent nor certain.

## FIFTH CAUSE OF ACTION

## DETENTION IN EXCESS OF 90 DAYS PURSUANT TO 8 U.S.C. § 1231 IS
## UNCONSTITUTIONAL

133.   Petitioner repeats and re-alleges paragraphs 1-148 of this petition

134.   Petitioner was issued a Final Order of Administrative removal on February 9,

2021 which was served on her on March 25, 2021.

135.   The Immigration Judge Ordered removal on June 15, 2021.

136.   It has been 83 days since the Immigration Judge's order, which remains on appeal,

and 165 days since the service of the Final Order of Administrative removal.

137.   Petitioner's detention has lasted 165 days and counting.

138.   Petitioner's detention will soon or already has surpassed the 90-day period after

which the alien shall be subject to supervision under regulations prescribed the

Attorney General. 8 U.S.C. § 1231(a) (3)

139.   Petitioner's removal is not imminent or certain and her continued detention under

8 U.S.C. § 1231 is unconstitutional.

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioner prays that this Court grant the following relief:

1)   Assume jurisdiction over this matter; and

2)   Enjoin Respondents from moving the Petitioner from the Southern District while

the habeas proceedings are pending

3)   Issue an order directing Respondents to immediately release Petitioner from

custody on her own recognizance or on reasonable conditions of supervision; and

or

4)   In the alternative, issue an order requiring Respondents to provide Petitioner with

constitutionally adequate, individualized hearings within 48 hours at which the

Department of Homeland Security bears the burden of establishing by clear and

convincing evidence that continued detention is justified in light of the grave risks

to Petitioner's health and well-being in ICE custody, and at which Petitioner's

vulnerability to COVID-19 is weighed as a factor in determining suitability for

release; and at which ability to pay and alternative conditions of release are

considered, or to immediately release Plaintiffs; and

5)   Award reasonable attorneys' fees and costs for this action; and

6)   Grant any other and further relief that this Court deems just and proper.


Dated:  Queens, NY
        September 6, 2021


                    Respectfully submitted,


                    AUDREY A. THOMAS, ESQ.
                    (Part 130 Certification – ID#: 4050548)
                    The Law Office of Audrey Thomas PLLC
                    *Attorney for Petitioner*
                    245-07 Francis Lewis Blvd
                    Rosedale, NY 11422
                    718-276-2729(ph) 718-276-0196(fx)
                    audreythomasesq@gmail.com